## Custody of a Minor.

Middlesex. January 7, 1981. — May 7, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & ABRAMS, JJ.

*Parent and Child,* Care and protection of minor. *Due Process of Law,* Care and protection of minor.

In a proceeding on a petition pursuant to G. L. c. 119, §§ 24 and 26, the judge was not required to make an express finding of general parental unfitness in adjudging the child in need of care and protection and committing him to the custody of the Department of Public Welfare where his findings that there were serious psychological differences between the mother and her child which the mother had refused to recognize or take steps to correct and which prevented the child from receiving sound and normal physical, mental, moral and educational development, that to remove the child from his foster parents would have deleterious effects on him, and that a determination of his status in a permanent sense was necessary to ensure his sound future development were supported by the record and were tantamount to a finding of parental unfitness in relation to the furtherance of the child's welfare. [600-601]

In a proceeding on a petition pursuant to G. L. c. 119, §§ 24 and 26, the judge properly accorded great weight to the desire of the fifteen year old child to remain with his foster parents and not to return to his natural mother. [601-602]

PETITION filed in the First District Court of Northern Middlesex on September 10, 1976.

On appeal to the jury session of the Lowell Division of the District Court Department the case was heard by *Murphy,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Jinanne S. J. Elder* for the respondent.

*William L. Pardee,* Assistant Attorney General, for Department of Public Welfare.

*June M. Gonsalves,* for the minor, submitted a brief.

LIACOS, J. The respondent, Mrs. F, appeals from a December, 1979, judgment of the District Court,[1] pursuant to G. L. c. 119, §§ 24 and 26, adjudging her son, W Dom G (Dom), in need of care and protection and ordering him committed to the custody of the Department of Public Welfare (department). We transferred the appeal to this court on our own motion. We affirm the judgment.

The respondent contends that the order of the District Court must be reversed because under the due process clause of the United States Constitution, as well as under G. L. c. 119, §§ 24, 26, as interpreted in our cases, she may not be deprived of the custody of her child in the absence of a finding that she is an unfit parent, and that such a finding must be predicated upon a showing that she suffers from shortcomings or handicaps that endanger the welfare of her child. The respondent further contends that the judge committed reversible error in giving great weight to the wishes of the minor child in determining the child's custody.

We summarize the events leading to this appeal. Dom was born in Thailand on January 27, 1964. His natural father died one month before his birth. Dom was the fourth child born to the G family. The respondent voluntarily placed Dom during his early childhood with an uncle with whom Dom lived for approximately a year and a half, after which he returned to live with his mother.

In 1972 the respondent married Ronald F, an American serviceman in Thailand. Two children were born of this marriage. In 1973, the F family moved to the United States. Dom, as well as one of his brothers, was once again left in the care of relatives in Thailand for about a year, after which Dom and this brother were brought to the United States. Subsequently, the marriage of Mr. and Mrs. F deteriorated and eventually ended in divorce in December, 1975. Left the sole source of support for her children, the respondent was then pregnant with her seventh child.

---

[1] Department of the Trial Court, six-man jury session (jury waived).

Around the time of the divorce the first signs of problems between mother and son began to appear. The respondent began experiencing difficulty controlling Dom. In September, 1975, Dom's fifth grade teacher, Mrs. DeWitt, noticed extensive behavior problems and absenteeism. She attributed part of the behavior problem to language difficulties. The absenteeism increased starting late December, 1975, as a result of the respondent's keeping Dom home in an attempt to discipline him for not doing household chores or doing them too slowly. By April, 1976, Dom was complaining almost daily to Mrs. DeWitt that he was being unfairly singled out among his siblings with respect to household chores, that he was being hit, and sometimes not allowed to eat. He threatened to run away from home.

Dom's complaints resulted in an investigation by the local board of health. Beginning in April a caseworker, Theodora Anderson, met with the family several times on a weekly basis. No instances of physical abuse of Dom were or have been substantiated, although the respondent admits to using mild corporal punishment as a form of discipline. Mrs. Anderson found the respondent anxious to be a good mother, although beset by serious financial problems, the difficulties of raising six children, and fears regarding her pregnancy. The respondent was finding it difficult to deal with Dom who was defying her requirements for his help around the house, not returning home in the evening when requested, wetting his bed, and talking back to her. Mrs. Anderson reported that the home was adequate although it suffered from a lack of space resulting in several children sleeping together on mattresses on the floor. Seeing no reason to remove Dom from the home at this time Mrs. Anderson observed: "I do not feel [the respondent] neglected or abused Dom. However, she sees her children and her responsibility to them somewhat differently than one would wish. She does not recognize their feelings, their desires, their separateness as individuals as much as she requires their obedience and their loyalty and dedication to the family unit." It was evident at this time that there were

serious psychological differences between Dom and his mother. Mrs. Anderson recommended psychological evaluation of Dom regarding his feelings toward himself, and feelings of rejection toward his mother, his family, and his culture, which she opined could have damaging repercussions for him if he did not receive help.

In July, 1976, to help alleviate the increasingly tense situation in the respondent's home, and with the respondent's approval, Mrs. DeWitt arranged for Dom to attend a summer day camp where she was working. Mrs. DeWitt provided Dom with round-trip transportation. One morning the respondent refused to allow Dom to go to camp. She was very upset because Dom had misbehaved over the weekend and had threatened the family. Because of the tenseness of the home situation and the respondent's difficulty in controlling Dom, Mrs. DeWitt and the respondent agreed that Dom should stay with Mrs. DeWitt until after the baby was born.

Near the end of August, after the baby was born, Dom refused to return home despite an attempt by the respondent to remove him physically from the DeWitt home. The local board of health referred the situation to the Department of Public Welfare. Dom was adamant about not returning home. He expressed his fear of returning home, being beaten, and becoming a slave to the family. He also expressed his feeling that he was not accepted as part of the family, and a desire to remain with the DeWitts. He threatened to run away if returned home.

The department caseworker, Mr. Francis, filed a care and protection petition on Dom's behalf pursuant to G. L. c. 119, § 24. On September 14, 1976, after a preliminary hearing, Dom was placed in the temporary custody of the department. The proceedings were continued for six weeks until an investigation could be completed. Because Dom refused to return home it was determined that he should remain temporarily with the DeWitts.

The department worker assigned to the case, Mrs. Peterson, found the respondent's home adequate and clean, and

the other children supportive of their mother. The case was continued several times while attempts were made to reunite Dom with his family. Regular weekly visits were scheduled in the respondent's home. Dom occasionally failed to show up for visits. Visits that took place generally resulted in arguments between Dom and his mother. Dom made unsubstantiated allegations of physical abuse during this period. The psychological problems between Dom and his mother were not resolved. Dom steadfastly refused to return home.

A psychological evaluation of Dom revealed that he was experiencing a "reactive disturbance"; that he was very angry, disturbed, and mistrustful of his mother as well as the DeWitts. Dom saw his mother as rejecting, punitive, and unloving. It was determined that counseling for Dom and his mother was imperative if mother and son were to be reunited. The respondent refused counseling because of the "mean" things Dom said to her in front of others.

By April, 1978, the respondent had conveyed threats to Dom that she would send him back to Thailand. She felt that he had relatives in Thailand who could look after him better than she could. By this time, Dom spent visitations with his family playing with his siblings and having little to do with his mother. Any interaction that did occur between the two resulted in hostility. The case work plan in June, 1978, was to increase visits and eventually to return Dom permanently to his family. But the respondent made no attempt to recognize any problems or to take steps helpful toward getting Dom returned to her.

In April, 1979, the psychologist recommended that Dom be placed in the permanent custody of the DeWitts. The judge summarized the psychologist's testimony as follows: "He found that Dom had closed a three year gap in his academic learning and was now almost at Grade level. He has definitely attached himself to the DeWitts and sees them as his psychological parents who will care for him. Dom still has severe psychological differences with his natural mother who he feels does not love him and will not care for

him and to take Dom out of the DeWitt family would be psychologically devastating and deleterious to his emotional growth as an adolescent because of the attachments he has made with them. Also to return Dom to his mother could potentially result in Dom's running away or the carrying out of the threats against his mother."

On June 21, 1979, Dom was adjudged in need of care and protection and committed to the permanent custody of the department. That judgment was affirmed after a trial de novo in December, 1979, in the proceeding which is the subject of this appeal. We now consider the merits of this appeal.

1. *Statutory and constitutional issues.* Today, in *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, ante* 573, 587 (1981), we set forth the appropriate statutory standards against which State attempts to deprive natural parents of the custody of their minor children must be measured. We need not repeat that entire discussion here. A few quotations suffice. "[T]he Commonwealth may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness." *Supra* at 589, quoting *Custody of a Minor (No. 1),* 377 Mass. 876, 882 (1979). "[T]he unfitness standard must be applied . . . whether the State proceeds under the care and protection statute (G. L. c. 119, §§ 23-29), the guardianship statute (G. L. c. 201, § 5), or the adoption statute (G. L. c. 210, § 3)." *Id.* at 589. A finding of parental unfitness may be predicated on the circumstances within a particular family, as they adversely affect the particular child, without regard to the general quality of parental conduct per se. "It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered child. Rather, it is the fact of the endangerment itself. As parens patriae the State does not act to punish misbehaving parents; rather it acts to protect endangered children." *Id.* at 591-592. The State may constitutionally deprive otherwise fit parents of custody of their

minor child upon a persuasive showing that return of that custody to the parents would create a substantial risk or likelihood of serious harm to the child. See *id.* at 590; *Bezio* v. *Patenaude*, 381 Mass. 563, 575 (1980); *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 639, 642 (1975).

The failure of the trial judge to make an express finding of general parental unfitness also does not warrant a reversal in this case. See *Wilkins* v. *Wilkins*, 324 Mass. 261 (1949). In adjudging Dom in need of care and protection and committing him to the custody of the department, the judge concluded in part: "(1) That [Mrs. F] is not an unfit [*sic*] in the sense that she is able to provide for her children adequate physical surroundings. . . . (4) That there are serious psychological differences between [Mrs. F] and her son Dom. (5) That [Mrs. F] refuses to recognize these differences and has consistently and persistently refused to take steps to correct them. (6) That these differences have prevented [Dom] from receiving sound and normal physical, mental, moral and educational development. (7) The passage of time has created a psychological bond between Dom and his foster parents and in which he has nurtured and developed. (8) To remove him from his foster parents at this time would have serious deleterious effects on Dom. (9) The reuniting of Dom and his mother will not take place under a temporary placement. . . . (11) A determination of his status in a permanent sense is necessary to ensure the sound future development of the child." These conclusions are amply supported by the judge's subsidiary findings of fact and the trial record. Moreover, they are tantamount to a finding of unfitness in relation to the furtherance of this particular child's welfare. See generally *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra.*

2. *Weight to be accorded the child's wishes.* Under the circumstances of this case the judge properly accorded "great weight" to the wishes of the fifteen year old child. The judge found that Dom "feels that his natural mother

has abandoned him on three occasions and does not love him and does not want to be returned to his mother and he wants to live with the DeWitts."

We believe the child's preference to remain with the DeWitts was a relevant factor in this case. In situations involving younger children who are not yet sufficiently mature to comprehend where their welfare lies, the courts are empowered, indeed obligated, to substitute their judgment for that of the child. See *Stone* v. *Duffy*, 219 Mass. 178, 182 (1914). However, it has long been the law of Massachusetts that the preferences of children of sufficient maturity may be considered. See *Baird* v. *Attorney Gen.*, 371 Mass. 741, 753 (1977), considered sub nom. *Bellotti* v. *Baird*, 443 U.S. 622 (1979), and cases cited. "Where a child has been placed in someone's care by agreement of the parents, the wishes of the child to remain in that person's care have been given weight." *Id.*, citing *Curtis* v. *Curtis*, 5 Gray 535, 537 (1855), and *Commonwealth* v. *Hammond*, 10 Pick. 274, 275 (1830).

In this case the judge expressly found Dom to be "bright, intelligent," and "articulate." Dom's preference in this case is the result of a deep and seemingly irremediable psychological rift between himself and his natural mother. The judge's findings persuade us that a forced reuniting of mother and son would only result in additional harm. Moreover, we have doubts whether an order committing Dom to the custody of the respondent could be enforced. Such an order would in any event be futile as Dom will soon reach his eighteenth birthday — on January 27, 1982 — at which time he will be fully in control of his own destiny in law, as well as in fact.[2]

3. *Disposition.* For the reasons stated above the judgment of the District Court is affirmed.

*So ordered.*

---

[2] We note also that the mother has a right until the child becomes eighteen to seek a review and redetermination of the current needs of the child once every six months. G. L. c. 119, § 26.