ARLENE FREEMAN vs. RALPH D. CHAPLIC, SR., & others.[1]

Worcester. December 9, 1982. — March 10, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Guardian,* Of minor. *Minor,* Custody. *Practice, Civil,* Guardianship
proceeding. *Parent and Child,* Custody of minor.

Although a child's maternal step-grandmother had not been a party to
proceedings in which the child's paternal grandparents were appoint-
ed as guardians of the child, the step-grandmother's motion to vacate
the appointment of the grandparents was properly before the court by
virtue of G. L. c. 201, § 33. [402-403]

A Probate Court judge did not have authority under G. L. c. 201, §§ 5
and 33, to vacate the appointment of a child's paternal grandparents
as her guardians and to appoint the maternal step-grandmother as
guardian in their place where the child's parents had assented to the
appointment of the grandparents as guardians and where the judge
did not find that the parents were unfit or that the appointed guard-
ians were unsuitable. [403-409]

PETITION filed in the Worcester Division of the Probate
and Family Court Department on September 21, 1981.

A motion to revoke appointment of guardians, filed on
October 2, 1981, and a petition for appointment of a guard-
ian, filed on January 26, 1982, were heard by *Conlin,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Regina Healy* for the defendants.

*Jinanne S. J. Elder (Marjorie Heins* with her) for the in-
tervener.

*Jeffrey Quinn* for the plaintiff.

LIACOS, J.  On April 21, 1982, a judge of the Probate and
Family Court vacated the appointment of Muriel F. and

---

[1] Muriel F. Chaplic and Judith Freeman Chaplic McDonald, intervener.

Ralph D. Chaplic, Sr. (Chaplics), as guardians with custody of their son's daughter, Lynn-Marie Chaplic, and entered a judgment appointing Arlene Freeman, the child's maternal step-grandmother, as guardian with custody. A single justice of the Appeals Court stayed the judgment pending appeal. The Appeals Court affirmed the judgment and ordered the rescript to issue immediately. *Freeman* v. *Chaplic*, 14 Mass. App. Ct. 493, 500 (1982). We granted the Chaplics' application for further appellate review. A single justice of this court then issued an order vacating the judgment entered pursuant to the rescript of the Appeals Court and reinstated the appointment of the Chaplics, pending the decision of this court. We allowed the motion of Judith Freeman Chaplic McDonald (Judith), the child's mother, to intervene. We reverse the judgment of the Probate and Family Court and order the reinstatement of the judgment appointing the Chaplics as guardians with custody.

We are without the benefit of a transcript of the evidence. We therefore turn to the findings of fact entered by the judge, court records of the proceedings, and an affidavit filed by the mother after the decision of the Appeals Court.[2]

We summarize those facts that are before us. Judith Freeman and Ralph Chaplic, Jr., were married in November, 1966. They had two children before they separated in 1969. Ralph, Jr., obtained custody of the children on December 12, 1969, but left them with his parents. The Chaplics filed a petition in 1972 to vacate the order granting custody of the two children to Ralph, Jr.[3]

---

[2] The Appeals Court did not have the benefit of a separate brief on behalf of the mother. The Appeals Court appears to have entertained some doubt as to the true wishes of Judith. *Freeman* v. *Chaplic*, 14 Mass. App. Ct. 493, 499 & n.6 (1982). The mother's intervention in these proceedings has put to rest any suggestion that the mother does not support the reinstatement of the guardianship of the Chaplics. We note also that the findings of fact issued by the judge did not indicate that he doubted that Judith wished the child to be placed with the Chaplics.

[3] While the petition has not been allowed, the Chaplics were given custody pending a hearing on the merits.

Several months after the separation of Ralph, Jr., and Judith, Judith gave birth to Lynn-Marie. Judith began experiencing emotional problems and decided to live with her father, Lawrence Freeman, and her stepmother, Arlene Freeman. Arlene had married Lawrence in 1958 when Judith was ten years old. Arlene Freeman has raised a considerable number of children.[4] As a consequence of a decree of divorce between Judith and Ralph Chaplic, Jr., which became final on March 7, 1974, the Freemans obtained custody of Lynn-Marie. The child lived with the Freemans for seven years, except for two brief periods in the summer of 1972 and the fall of 1973 when she lived with Judith.

Judith eventually remarried and gave birth to two more children. On September 22, 1977, she filed a complaint for modification seeking to gain custody of Lynn-Marie. The Freemans assented to the modification. The Chaplics, however, objected, and a guardian ad litem was appointed. The guardian ad litem recommended that custody be granted to Judith, and Lynn-Marie went to live with Judith and her new husband. The Freemans visited frequently, and Lynn-Marie often stayed with them during school and summer vacations.

The situation changed dramatically during the spring and summer of 1981. On May 1, 1981, Judith's father, Lawrence, died. Two months later, Judith and her second husband separated. Judith's psychological problems became acute, and she was hospitalized. She has been under medical care for these problems since that time. Lynn-Marie resided briefly with an uncle and an aunt of the stepfather. On September 3, 1981, Lynn-Marie went to live with Arlene Freeman.

The Chaplics then filed a petition for guardianship of Lynn-Marie, to which her parents assented. On Septem-

---

[4] The judge found that Arlene Freeman has raised three children and has been a foster parent to over sixty-five children. There is no finding as to how many children still live in the Freeman household.

ber 21, 1981, the Chaplics were appointed guardians of Lynn-Marie with custody.[5] Lynn-Marie adjusted well in the Chaplics' household. She earned excellent grades at school and participated in a range of activities. She also developed a relationship with her brother and sister, who are in the custody of the Chaplics, and has spoken with her father, who resides in Florida, by telephone.

On October 2, 1981, Freeman filed a motion to revoke the appointments and moved to have herself appointed the guardian with custody. On October 19, 1981, the judge entered an order that Freeman have liberal visitation rights, and that the Family Service Department of the Probate Court conduct an investigation. The case was continued.

During this period, Judith moved in with the Chaplics who legally adopted her on February 12, 1982. She continued to undergo treatment to correct her psychological difficulties and was hospitalized briefly. While she testified at a hearing on Freeman's motion, she did not become a party to the proceedings.

On April 21, 1982, the judge revoked the decree appointing the Chaplics as guardians and appointed Freeman in their stead. The judge also issued findings of fact and conclusions of law. The sense of his findings is as follows. First, he found that both the Chaplics and Freeman were "fully capable" of caring for Lynn-Marie. Second, he found that Judith possessed the capacity to assent to the appointment of the Chaplics as guardians of Lynn-Marie. Third, he apparently found that the assent of the parents to the appointment of the Chaplics was entitled to little weight since the father has had little contact with Lynn-Marie, and Judith was still suffering from emotional problems. Fourth, he found that Lynn-Marie had expressed a preference to live with Freeman. Fifth, he found that the plan assented to by both of Lynn-Marie's parents was well designed to maintain the closest possible ties between Lynn-Marie and her par-

---

[5] Freeman did not receive notice of the Chaplic petition. The statute makes no provision for such notice. G. L. c. 201, §§ 2 and 5.

ents, siblings, and paternal grandparents, the Chaplics. Sixth, he found that the appointment of Freeman would serve the best interests of the child.

Apparently on the basis of this last finding, he vacated the appointment of the Chaplics and entered a judgment that Arlene Freeman be appointed guardian, with custody, of Lynn-Marie. Except for a brief period, however, Lynn-Marie has remained with the Chaplics by orders of single justices of the Appeals Court and this court.

1. The judge appears to have treated Freeman's motion to vacate the appointments as arising under Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974), or its counterpart Mass. R. Dom. Rel. P. 60 (b). The purpose of that rule, however, is to relieve "a party or his legal representative from a final judgment, order, or proceeding." Since Freeman was not a party to the original proceedings below, it is not clear whether, first, she has standing to seek relief after judgment under rule 60, or, second, whether her petition states a basis for relief under the rule. We conclude, however, that we need not resolve these questions.

We believe that Freeman's motion could have been brought before the Probate Court by virtue of G. L. c. 201, § 33.[6] General Laws c. 201, § 33, gives the power to a judge of the Probate Court to remove a guardian under the circumstances specified by the statute. In *Gray* v. *Parke,* 155 Mass. 433, 435 (1892), we indicated that a party could act as the next friend of the ward and seek to have a guardian removed as unsuitable. In light of her concern for the

---

[6] General Laws c. 201, § 33, as amended through St. 1956, c. 314, § 12, provides: "If a guardian or conservator becomes mentally ill or otherwise incapable of performing his trust or is unsuitable therefor, the probate court, after notice to him and to all other persons interested, may remove him. If the petition for removal contains a prayer therefor the court may, upon such notice as it considers reasonable, appoint a successor to fill any vacancy caused by such removal, without the filing of a separate petition for that purpose. Upon the request of a guardian or conservator, the probate court may allow him to resign his trust. Upon such removal or resignation, and upon the death of a guardian or conservator, another may be appointed in his stead by the same court."

well-being of Lynn-Marie, Freeman properly could bring to the attention of the judge of the Probate Court any facts which might render the appointed guardians subject to removal. Given her longstanding relationship with the child, Freeman was able to bring additional factual matters to the attention of the judge. Hence, without considering the propriety of a rule 60 (b) motion, we conclude that the motion brought by Freeman was properly before the Probate Court. The judge did not abuse his discretion by entertaining Freeman's motion to vacate the appointment of the Chaplics.

2. We turn now to the merits. By virtue of G. L. c. 201, § 1, a judge of the Probate Court may, "if it appears necessary or convenient," appoint a guardian of a minor. The appointment of a guardian, however, does not extinguish the rights of the parents to the custody of their child. The question of custody is determined by reference to G. L. c. 201, § 5.[7] That section provides that the parents, and not the guardian, shall have custody of the child "unless the court otherwise orders." The power of the court to "otherwise order[ ]" is circumscribed by the terms of § 5. The judge must find either that each parent has assented to an order that the guardian shall have custody or that the parents are "unfit" to have custody. Once appointed, a guardian may

---

[7] General Laws c. 201, § 5, as amended through St. 1978, c. 381, § 1, provides: "The guardian of a minor shall have the custody of his person and the care of his education, except that the parents of the minor, jointly, or the surviving parent shall have such custody and said care unless the court otherwise orders. The probate court may, upon the written consent of the parents or surviving parent, order that the guardian shall have such custody; and may so order if, upon a hearing and after such notice to the parents or surviving parent as it may order, it finds such parents, jointly, or the surviving parent, unfit to have such custody; or if it finds one of them unfit therefor and the other files in court his or her written consent to such order. The marriage of a person under guardianship as a minor shall deprive his guardian of all right to the custody and education of such person but not of the care and possession of such person's property. If a corporation is appointed guardian of a minor, the court may, subject to the right of his parents, or of the spouse of a minor, as provided in this section, award the custody to some suitable person."

be removed if he "becomes mentally ill or otherwise incapable of performing his trust or is unsuitable." G. L. c. 201, § 33.[8] The question before us, then, is whether the judge was free to vacate the appointment of the Chaplics and to appoint Freeman in their stead without finding the Chaplics "unsuitable" or the parents "unfit." Obviously, unless the guardian is found unsuitable, the second question, whether the parents are "unfit," does not arise. There has been no finding by the judge of the Probate Court that the Chaplics were unsuitable as guardians. We consider both issues, however, because of the reasoning adopted in this case by the judge and the Appeals Court.

The Appeals Court held that the judge need not make a finding that the child's parents are unfit before appointing a guardian with custody, despite the lack of parental consent. *Freeman* v. *Chaplic*, 14 Mass. App. Ct. 493, 497 (1982).[9] The court reasoned that, since "the contest is between the paternal grandparents and the maternal step-grandmother," "[a] determination of parental unfitness to have custody is . . . of little relevance." *Id.* at 498. Apparently relying on its view of the general equity powers of the Probate Court, it concluded that the judge was free to follow his own vision of "the best interests of the child" and appoint Freeman guardian with custody. We disagree with this approach to the issues of this case.

We consider whether the judge's findings warrant a conclusion that the parents are unfit.[10] Unfit is a "strong word," *Richards* v. *Forrest*, 278 Mass. 547, 552 (1932), and that determination should not be reached easily. *Custody of a Minor*, 383 Mass. 595, 601 (1981). *Bezio* v. *Patenaude*,

---

[8] The other grounds for removal provided by § 33, namely, the mental illness or incapacity of the guardian, are not an issue in this case.

[9] The Appeals Court did not consider the question of the unsuitability of the guardian.

[10] A finding of unfitness may be inferred from the judge's subsidiary findings. *Custody of a Minor*, 383 Mass. 595, 601 (1981). A fair reading of the judge's findings suggests that he did not believe that Judith was unfit. We address the issue to clarify the issues presented here.

381 Mass. 563, 575-576, 578 (1980). Cf. *Santosky* v. *Kramer*, 455 U.S. 745 (1982). We approach this inquiry with reference to Judith's ability to care for Lynn-Marie, and to the provisions that she has made for those times when she might be unable to care for the child. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 581-582 (1981). Cf. *Moore* v. *East Cleveland*, 431 U.S. 494, 504-505 (1977).[11]

We conclude that the judge's findings do not warrant a determination that either the parents are unfit or the guardians are unsuitable.[12] Those findings do not suggest that Lynn-Marie has suffered any harm or trauma as a result of living with her mother and the Chaplics. Contrast *Custody of a Minor, supra* at 601 (removal of child from foster parents would have serious deleterious effects); *Wilkins* v. *Wilkins*, 324 Mass. 261, 263 (1949) (child suffered severe emotional trauma as a result of visits with her parents). Rather, the judge's findings all point to the conclusion that Judith, with the aid of the Chaplics, is "currently fit to fur-

---

[11] In *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 581-582 n.7 (1981), we quoted with approval the following language from *Moore* v. *East Cleveland*, 431 U.S. 494, 505 (1977): "Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. Decisions concerning child rearing, which . . . have [been] recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household — indeed who may take on major responsibility for the rearing of the children. Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life." Given this language, we have little doubt that Judith's decision to raise Lynn-Marie in the Chaplic household is entitled to some measure of constitutional protection.

[12] Whether a guardian is "unsuitable" turns on an examination of the fitness of the guardian in the particular circumstances of the case. See *Gray* v. *Parke*, 155 Mass. 433, 434-438 (1892). In the present case, there is no question as to the capacity of the Chaplics to care for Lynn-Marie and to further her welfare. There are also no circumstances shown in this record which would render them otherwise unsuitable. See *Bezio* v. *Patenaude*, 381 Mass. 563, 572 (1980).

ther the welfare and best interests of the child." *Bezio* v.
*Patenaude, supra* at 576.

Given this conclusion as to the fitness of the mother,[13] we
are unable to see how the result reached below can be re-
conciled with the terms of G. L. c. 201, §§ 5 and 33. On the
one hand, the parents have not assented to the award of cus-
tody to Freeman. In fact, they oppose it. On the other
hand, the judge did not find that both parents were unfit to
have custody, nor did he find the appointed guardians un-
suitable. The statutes do not permit the judge to award
custody to another guardian in these circumstances,[14] *Bot-
toms* v. *Carlz*, 310 Mass. 29, 33 (1941), and we decline to
hold that the general equitable powers of the Probate Court
may be used to circumvent the mandates of §§ 5 and 33.[15]

We recognize that the judge is not bound to grant custody
to a guardian or to maintain custody in the guardian, sim-
ply because the guardian has obtained the consent of a
minor's parents. If the guardian were determined to be
"unsuitable" within the meaning of G. L. c. 201, § 33, an

---

[13] The Appeals Court also did not find the mother to be unfit. *Freeman*
v. *Chaplic*, 14 Mass. App. Ct. 493, 497 (1982).

[14] Freeman relies on our decision in *Perry* v. *Perry*, 278 Mass. 601, 605
(1932), where we stated that, under G. L. c. 208, § 28, the Probate Court
need not find the parents unfit before awarding custody to another per-
son. *Perry* involved a divorce between parents disputing custody of a
child of the marriage. The language of that section, which expressly
authorizes the court to award custody to a third person, if "expedient," is
in sharp contrast to the language of G. L. c. 201, § 5, and is inapplicable
to this proceeding.

[15] We have, on occasion, stated that the Probate Court has broad
equitable powers "to act in the best interests of a person under its jurisdic-
tion." *Superintendent of Belchertown State School* v. *Saikewicz*, 373
Mass. 728, 756 (1977). See *Feinberg* v. *Diamant*, 378 Mass. 131, 132,
136-137 (1979); G. L. c. 201, § 6. But a grant of equitable powers does
not permit a court to disregard statutory requirements. 2 Pomeroy's
Equity Jurisprudence § 425, at 189 (5th ed. 1941). This principle is borne
out by the close attention we have paid to the statutory framework in
cases arising under G. L. c. 201, §§ 5 and 33, and related statutes. See,
e.g., *Bezio* v. *Patenaude, supra*; *Petition of the New England Home for
Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631,
637-641 (1975).

award or maintenance of custody would not be appropriate under either G. L. c. 201, § 5, or § 33. In such circumstances, the judge may properly inquire into the fitness of the parents to have custody. The inability of the parents to care for the child or to make suitable arrangements for the child will be relevant. But if the parents are found to be fit, the judge is bound by the first sentence of § 5 to grant custody to them, or, in the alternative, to honor their wishes, to the extent permitted by statute, on the choice of a guardian.

We believe that this view is consistent with the principles espoused in the cases of this court as well as those of the United States Supreme Court. We have said that in certain circumstances a parent "may . . . nominate a relative or friend to care for [a] child. In the absence of unfitness of such nominees the State's interest to justify intervention on behalf of the child is de minimis." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 581-582. While the State here is not seeking custody of the child for itself, its intervention against the wishes of the parents must serve some substantial interest of the State. *Custody of a Minor, supra* at 600-601. *Moore* v. *East Cleveland, supra* at 499. As a general matter, granting custody to a party opposed by the parents where neither the parents nor the parents' nominee is unfit or unsuitable, would not measurably advance any interest of the State and would raise serious constitutional difficulties.[16]

We also believe that insufficient attention has been paid to the specific wishes of Judith to strengthen the natural bonds of the family. The judge found that "the plan assented to by both of Lynn-Marie's parents was well designed to maintain the closest possible ties between Lynn-Marie and her parents, siblings and paternal grandparents." The result of granting the Chaplics custody will be to permit Lynn-Marie to be reared in the company of her siblings and

---

[16] Our resolution of the case relieves us of the duty to decide whether that resolution is also mandated by constitutional principles. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 587 n.14.

her mother.[17] Thus, this case cannot simply be viewed as a contest between grandparents; the interest of the natural parent to participate in the rearing of her child is also at stake.[18]

Our cases have accorded "considerable weight to the importance of the child's being reared in a normal family relationship with her own next of kin." *Bezio* v. *Patenaude, supra* at 572-573. See *Custody of a Minor (No. 1)*, 377 Mass. 876, 880-882 (1979). We have repeatedly held that the ties of affection which exist between a child and a person who has had custody of the child must yield to the desires of the parents to raise the child in a fit environment. *Bezio* v. *Patenaude, supra. Malkin* v. *Pine*, 351 Mass. 358 (1966). *Duclos* v. *Edwards*, 344 Mass. 544, 546 (1962). *Stinson* v. *Meegan*, 318 Mass. 459, 465 (1945). *Gordon* v. *Gordon*, 317 Mass. 471, 477 (1945). *Richards* v. *Forrest*, 278 Mass. 547, 556 (1932). Contrast *Custody of a Minor*, 383 Mass. 595, 601-602 (1981) (child's preference to live with foster parents resulted from deep and irremediable psychological rift with parent). We do not discount the ties which exist by virtue of the period during which Freeman had custody of the child. But the interests of the child in being reared

---

[17] Unfortunately, it does not seem possible for Lynn-Marie to be raised with all her siblings, i.e., the children of Judith's second marriage. This circumstance alone, however, does not justify State intervention. Rather, it is for the parents to choose in which household the child will be reared, unless it can be shown that their choice would threaten the welfare of the child. Cf. *Bezio* v. *Patenaude, supra* at 576; *Custody of a Minor (No. 2)*, 378 Mass. 712, 718-719 (1979). The fact that Lynn-Marie's brother and sister reside in the Chaplic household with the mother and paternal grandparents is of importance. *Duclos* v. *Edwards*, 344 Mass. 544, 546 (1962). *Stinson* v. *Meegan*, 318 Mass. 459, 465 (1945).

[18] We cannot disregard the fact that granting custody to Arlene Freeman would result in separating Lynn-Marie from Judith. While it is possible that Judith could gain custody in the future, several factors counsel against this possibility. The child is now thirteen years old, and her own wishes, rather than those of her mother, will be given increasing weight. See *Custody of a Minor*, 383 Mass. 595, 601-602 (1981). Moreover, should Judith regain custody later, it would necessitate yet another move for the child.

with her natural family, as expressed in G. L. c. 201, § 5, and our cases, must take precedence.

We reverse the judgment of the Probate and Family Court and order the reinstatement of the judgment appointing the Chaplics as guardians with custody.[19]

*So ordered.*

---

[19] An attorney for the child, appointed by the Probate Court, appeared at oral argument before this court and offered a written report for the consideration of the court only. The attorneys for the mother and the Chaplics objected. We have not received the report. We note that our disposition does not preclude new proceedings under G. L. c. 201, § 33. Should any party, or the attorney for the child, have information pertaining to the suitability of the guardians, such information would be proper for consideration by the judge of the Probate Court in an appropriate proceeding.