PETITIONS OF CATHOLIC CHARITABLE BUREAU OF THE
ARCHDIOCESE OF BOSTON, INC., TO DISPENSE
WITH CONSENT TO ADOPTION.

Essex. February 11, 1986. — April 9, 1986.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption.
*Evidence,* Child custody proceeding. *Probate Court,* Guardian ad litem.

On petitions brought by a social service agency seeking to dispense with the
need for parental consent to the adoption of the parents' minor son and
the mother's minor daughter, the judge's decision that the parents were
currently unfit to care for the children was supported by clear and con-
vincing evidence, including evidence of past abuse and neglect of the
children while under the protection of the mother, who continued to
show an incapacity to appreciate the seriousness of the situation, evidence
that the father had no real desire to have custody of his son, and testimony
of professionals that the children would be at great risk if returned to
the mother and father. [57-58]
In a proceeding to dispense with the need for parental consent to the adoption
of two minor children, the judge did not err in relying on various reports
containing hearsay in making his findings inasmuch as the parents were
the proponents of one of the reports, and the authors of all the reports
testified at trial and were subject to cross-examination by counsel for
the parties; nor was there error in the judge's exclusion of certain evidence
alleged by the mother to be favorable to her case. [59]
The record of a proceeding to dispense with the need for parental consent to
the adoption of the parents' minor son and the mother's minor daughter
revealed no evidence of bias by the judge against the son's father.
[59]
On appeal by parents from the allowance of petitions dispensing with their
consent to the adoption of two minor children, this court declined, in
the circumstances, to decide whether the judge should have appointed
independent counsel for the children. [59-60]
BROWN, J., concurring, expressed the view that court-appointed counsel for
the father had exceeded the limits of proper representation of his client.
[60-61]

PETITIONS filed in the Essex Division of the Probate and
Family Court Department on September 30, 1983.

The cases were heard by *Haskell C. Freedman, J.*

*Margaret G. Barmack* for the mother.

*Thomas F. Schiavoni* for the father.

*William J. Lundregan* for Catholic Charitable Bureau of the Archdiocese of Boston, Inc.

*Celeste R. Niarchos,* guardian, amicus curiae, submitted a brief.

PERRETTA, J. On September 24 and 29, 1982, reports required by G. L. c. 119, § 51A, were filed on behalf of the natural parents' son and the mother's daughter. Temporary guardianship of the children was granted to the Catholic Charitable Bureau (bureau) in December of that year and was continued at three-month intervals. See G. L. c. 201, § 4. In 1983, the bureau brought the present petitions to dispense with the natural parents' consent to adoptions of the children under G. L. c. 210, § 3. The petitions were tried in October, 1984, and allowed in May, 1985.[1] On appeal, the parents, who have been represented by individual court-appointed counsel since June, 1984, argue that the judge's finding that they are currently unfit to care for the children rests upon findings which pertain to past acts and that these findings are tainted by inadmissible evidence. The father further argues that the judge's impartiality as the finder of fact was colored by his doubts as to the father's paternity of the son. Additionally, the guardian ad litem (an attorney) appointed by the judge under G. L. c. 215, § 56A, was granted leave by a single justice of this court to file a brief as an amicus curiae, Mass.R.A.P. 17, 365 Mass. 864 (1974), so that she might argue that the judge erred in not allowing her to act as counsel for the children at trial. We affirm.

I. THE EVIDENCE.

The third of nine children, the mother left school after the tenth grade. A year later, when she was seventeen, she left her family's home and, eventually, moved in with a man with

---

[1] Reasons for the delay between completion of the proceedings and the judgment were given by the judge in his detailed and comprehensive findings and relate to obtaining the transcripts of the hearing.

whom she cohabitated for about two years. During that relationship, she became pregnant by another man. Her daughter was born on January 11, 1979. According to the mother, the child's father died in the "middle" of 1979.

In February, 1979, the mother, with her daughter, moved to a small, two-bedroom, townhouse apartment in a public housing project, where she resided with a man by whom, on February 21, 1982, she had a son. Her son's paternity was not denied by the man with whom she was living and was formally acknowledged by him during these proceedings. Hence, we refer to him, in respect to the son, as the father. As described by the guardian ad litem in her report, the relationship between the mother and father was "characterized by discord and occasional violence." The mother testified that she and her father argued "a lot," that he had "push[ed]" and "shov[ed]" her, and "maybe" even "slap[ped]" her once. However, he never punched her.

On August 24, 1982, the mother brought her daughter, then three and a half years old, to her pediatrician. A physical examination revealed: "[The child] had a bright red sore throat and she had a copious green vaginal discharge, a large amount of a green vaginal discharge. And the area around the tissues surrounding the vagina was swollen and reddened." The doctor could not examine the daughter's hymen during this visit because of the swelling and discharge. Cultures were taken,[2] medicine was prescribed, and a follow-up visit was scheduled. The mother did not return to the pediatrician until a social worker from the Department of Social Services (department), on or shortly after September 24, urged her to do so.

Involvement with the children by the department came about when the mother took the then seven month old son to a hospital emergency room on September 22. The mother advised hospital personnel that he had fallen from his walker. At the time of the fall, he appeared to be uninjured, but he became

---

[2] The culture tests revealed neisseria. As explained by the pediatrician, there are "several genuses of neisseria," one of which is gonococcus. For various reasons not here particularly pertinent, it could not be determined from the cultures whether the child had gonorrhea.

irritable and refused to use his right arm. An orthopedic surgeon who examined the son testified that at the "shoulder and arm . . . the point of injury . . . there was swelling and deformity" which indicated an "underlying fracture." The child's X-rays revealed an "angulated fracture" of the upper-arm bone. The doctor's opinion was that the injury was caused by a "strong force . . ., either a direct blow or a twisting type of injury." His opinion was based on the fact that "[n]ormally, infants' bones are fairly pliable and a mild force will produce no injury [and] a moderate force will usually bend the bone but not break it . . . it usually takes a fairly severe force to break it completely in two."

Explaining that she was not in the room with her son at the time of his injury, the mother expressed her view that the infant's arm became entangled in the leash of the family dog. On Sepember 24, a hospital social worker made a § 51A report to the department, and the next day the orthopedic surgeon wrote to the department stating that the child's "being in a jumping seat or tangled with a dog leash would not seem to be the type of mechanisms that would produce this type of injury and the possibility of his having received direct trauma to the arm should be investigated."

During the department's investigation, the mother told the social worker about her daughter's medical condition. The social worker instructed the mother to take her daughter back to the pediatrician. This was done on September 29. Examination of the daughter revealed that her "hymen was torn in several places." Based upon that information the pediatrician made a report under § 51A. At trial, the pediatrician testified that when she told the mother that her daughter had been sexually abused, the mother was "concerned." The mother could attribute the abuse to only two possible sources: (1) sexual play between her daughter and a three-year-old boy who lived nearby and who might recently have been abused by his adolescent male baby-sitter; or (2) a possible child pornography ring that she suspected was operating in the area.

After the department substantiated both of the § 51A reports, it referred the children to the bureau, on September 30, 1982,

for a protective services assessment. While the assessment was being done, the bureau provided the mother with weekly home visits with a nurse and day care for the daughter. The social worker doing the assessment spoke with the mother, either on the telephone or during home visits, about fifteen times between September 30 and December 10, 1982.

Although the mother cooperated with the social worker, her cooperation was "limited." As explained by the social worker at trial, the mother refused to divulge any information about the father or his relationship with her and the children. Further, the mother was unwilling to go beyond a "porno ring" explanation for her daughter's sexual abuse to explore other possibilities within her family. The mother insisted that "she needed to save face within her neighborhood, that the Probation Department . . ., the state [police] . . ., or somebody else would somehow do it . . ., that we were all making too big a deal of this and that it's all behind her now and let's just move on."

Offers by the bureau for a counselling referral were rejected by the mother, who instead sought independent counselling. The bureau social worker testified that, although the mother did obtain counselling, she was "quite adamantly opposed to any access [by the bureau] to that therapist, to know anything about what the nature of that involvement" with the therapist was. The social worker found the mother to be "really lacking" in any "initiative" to ascertain "how this abuse had happened to both of her children." The mother was found to be "in some ways more concerned and more protective of her boyfriend [the father] than she was of her own children."

As the bureau's involvement continued, the mother "became hostile and less cooperative. She would participate in only those services she wanted, she would release no information regarding her therapy, and she led the social worker to believe that as of late 1982, she was no longer involved with the father. On December 2, she advised the social worker that she had decided to cease all cooperation and to fight against the bureau's intervention. The social worker urged against this, explaining to her that she could lose her children. The mother was confi-

dent, however, that the worst that could happen would be that a court would require interference by the bureau. Attempts by the social worker to see or speak with the mother were unsuccessful. Consequently, on December 17, the bureau sought and obtained guardianship of the children, who were immediately placed in a foster home. On December 20, 1982, the mother and father met with the social worker at her office to discuss their case. The father, however, became "hostile" and left the meeting before it was over.

Visitation rights at the bureau's office were exercised by the mother, who, on March 2, 1983, was allowed to take her children overnight. When the daughter told her foster mother that she had slept with her mother and father, the bureau cancelled further overnight visitation.[3] Observations by the social worker of the mother, the father, and the children during an office visit on April 8, 1983, revealed to the social worker what she described as the daughter's "preference" for the father almost to the exclusion of the mother. Although the social worker had "serious concerns" about the daughter's relationship with the father, he "may be more skilled at meeting the children's emotional needs than is the case with" the mother.

Further examination of the children was also conducted during this time. A complete skeletal X-ray of the son revealed a "healed, but previously fractured left sixth rib that was not detected" when the child was X-rayed in September, 1982. The daughter was referred to the New England Medical Center Hospital, Division of Child Psychiatry, for evaluation.

In an interview with the evaluators, the mother described the father as a nice, supportive, even-tempered man. The evaluators, however, found the mother to be "very guarded," "angry and teary-eyed about the evaluation process," and "disturbed" about people " 'making a big deal' " about the sexual abuse of her daughter. She saw no point in being interviewed about the matter because she had no idea who was responsible.

---

[3] At trial, the mother refuted the sleeping arrangements. The father had been present because the mother believed that he had as much right to see his son as she had to see her daughter. The children slept together in one bedroom, she slept alone in the other, and the father slept downstairs.

When specifically asked about her reactions to her daughter's abuse, the mother responded in a manner that led the evaluators to conclude that she was "more troubled by the evaluation process she's going through, no mention [of] the possible trauma [the daughter] has with sexual abuse."

Trauma to the daughter was clear. The evaluators found her to be an "extremely anxious child" and that her anxiety was "central to sexual scenes and to deprived themes." Critical to the child's evaluation was her "doll play." The child "enacted scenes with the father doll" which raised serious questions in the evaluators' minds about the child's relationship with the father.

We quote the evaluators' description of the daughter's play with the dolls: "Patient gave the dolls baths and spontaneously fondled the male genitals, the female breasts and inserted fingers and objects into the doll's vaginal areas in a driven, compulsive manner. Quality of the play was highly sexualized. Patient did not respond to direct questions about father-figure . . . but enacted a scene with the Black Father doll[4] that involved father chasing a terrified child who screamed in distress. Patient hid behind chair during this scene and seemed highly anxious. She appeared both over-stimulated and driven by the sexualized scenes, characteristic of post-traumatic play."

On May 23, 1984, the evaluators concluded that the child was in need of therapy "to enable her to work through her anxieties and fears pertinent to the sexual abuse." The mother "should become involved in parent guidance work with [the daughter's] therapist as well." Because of the "severity" of the daughter's "symptoms of sexual abuse" and the mother's "tendency to minimize the events and [her] reluctance to cooperate with evaluating the situation more deeply," the evaluators did not recommend a reunion between the two until after a period of therapy. The issue of a reunion could then be "re-evaluated." When informed of the results of the evaluation, the mother was of the view that the New England Medical Center Hospital was "full of crap."

---

[4] The mother and daughter are white, and the father is black.

Visits between the father and his son occurred on a spasmodic basis and took place at the bureau's office. On the first visit, the son did not even recognize the father. During all the visits, which, for reasons not traceable to the bureau, were few,[5] the son would not voluntarily initiate any physical contact with his father, and, at the end of the visits, the son "separated without difficulty from his father."

On November 22, 1983, a social worker with the bureau met with the mother's therapist. The therapist indicated that the goal of the therapy was to assist the mother in " 'becoming more able' to parent and reunite her with her children." The therapist did not testify at trial, and the mother's testimony concerning her progress was to the effect that, between counselling and parenting courses, she was learning to refuse to allow her children to control her and how to resist the demands children normally make, such as for candy and things of that nature. The mother had also sought and obtained employment as a nurse's aide in a convalescent home, which supplied her with a letter of recommendation.

The mother further testified, on October 23, 1984, that she still sees the father and that as recently as a "couple of weeks ago" he had stayed overnight at her house. She had earlier indicated to the bureau social worker, in March, 1984, that she knew the bureau wanted the father " 'out of the picture [but] I don't.' "

Summarizing the attitude of the mother and the father throughout this entire process, 1982 through 1984, the bureau social worker testified that neither the mother nor the father had indicated "any strong concern about what happened to the children" and that if the children were returned to them, they would not have the ability to protect them.

Although the current relationship between the mother and the father is unclear, they were no longer residing in the same household in 1983 and 1984. They maintain, at the least, a friendship. The father is neither anxious nor ready to assume

---

[5] The father did not visit the son between March and June, 1984. On June 18, 1984, the father requested a visit, adding that " 'my lawyer pointed out that it would be good idea to visit' " him.

custody of his son. He does, however, want his son reunited with the mother.

## II. THE FINDINGS.

That the judge exercised the utmost care in deciding the petitions is demonstrated by his specific and detailed findings, in which he not only set out his reasons for concluding that the mother and the father are currently unfit to care for and protect the children, but also explained the reasons for refusing to give weight to the evidence favorable to them. See *Custody of Two Minors*, 396 Mass. 610, 619 (1986), and cases therein cited.

The father is the natural parent of the son only, and his claim to that child[6] is somewhat limited. Although he has

---

[6] There is intimation in the concurring opinion that court-appointed counsel for the father may have been too zealous in representing his client. As this is an issue which has broad impact, we think it important to note that there is no unanimity as to the remarks set out in the concurrence. The main opinion should be read as reflecting the view that it is because of (rather than in spite of) counsel's efforts that our unanimous result is based upon a full exploration of all the facts pertinent to the issues raised by the petitions.

It is not open to dispute that the father had a right to court-appointed counsel. See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 3-5 (1979). Even though the father made no serious effort to obtain custody of his son or to visit with him regularly, he had a right to express a preference that the mother have custody of the son. Cf. *Freeman* v. *Chaplic*, 388 Mass. 398, 406-409 (1983).

Furtherance of the father's position was dependent upon the mother's current fitness to care for the son and the best interests of that child. Throughout these proceedings there lurked a suspicion that the daughter's sexual abuse (and perhaps the son's broken arm and rib) was caused by the father with the sufferance of the mother. However, there is no indication that counsel for the father participated in these proceedings only to vindicate the father without regard for the children or the evidence. Rather, consistent with the purpose of the proceedings and in keeping with his professional responsibilities, counsel for the father joined with counsel for the mother, and together they elicited evidence favorable to the mother. Through their combined efforts they produced testimony to show that the mother had made efforts which she perceived to be genuine to secure custody of her children. In the opinion of some of the witnesses, her cause was not entirely hopeless if she could bring herself to accept professional assistance, which, as it turned out, she either could not or would not do.

For the overwhelming number of attorneys accepting clients by appointment of the court, the acceptance is with full knowledge that their efforts will not be adequately compensated. The work these attorneys do benefits

contested the petition relative to his son, he showed no realistic plans involving his ability to care for his child. Indeed, his visits with his son throughout these proceedings were minimal and apparently motivated, to some degree, by his desire to prevail against the bureau and have the son returned not to him but to the mother. Consistent with this position, his argument on appeal is, in large part, concerned with the current parental fitness of the mother.

Of the one hundred and sixteen findings made by the judge, the mother and father primarily attack three: (1) that the son's broken arm was the result of abuse by the mother; (2) that the daughter suffered sexual abuse while in the mother's custody and "by a member of the household and not by any person outside the home"; and (3) that it was not necessary to determine "with absolute certainty" how the children were abused because the real issue is that they were abused while under the protection of the mother, who "denies the problem" and its seriousness. Characterizing these findings as internally inconsistent, the parents (especially the mother) argue that the ultimate finding of current parental unfitness is based upon the flawed reasoning that, because the children were harmed in the past and the mother cannot now explain how, she is currently unfit.

We do not agree with the parents' over-simplification of the judge's well-reasoned decision. There is no dispute that the children were injured while in the mother's care and under her protection. The evidence convincingly demonstrates that she has never appreciated the severity of those injuries or the magnitude of the problem they present. There is little, if any, expectation that she can meet the needs of her daughter, especially those now resulting from the nature and extent of the abuse inflicted. Nor does physical violence seem intolerable to the mother, who admits both to being pushed, shoved, and slapped by the father and to maintaining a relationship with

the public as well as the clients and furthers a fine tradition of the profession. See *Edgerly* v. *Commonwealth,* 379 Mass. 183, 185-186 (1979). In the circumstances of this case, we think that an intimation that counsel may have come close to, or gone over, the line, could give unnecessary cause for hesitancy on the part of attorneys in accepting appointments.

him which includes allowing him to stay overnight at her house, even as recently as two weeks prior to the instant hearing.

Although the mother arranged to receive counselling, she selected a therapist independent of the bureau, a perfectly permissible option on her part. However, she refused the bureau access to the therapist, thereby precluding an evaluation of the therapy being received and whether it was of the type needed in view of the circumstances. The mother's description of her counselling sessions and courses in parenting skills was, at best, vague and, to the extent revealed, far from the type and degree that other evidence accepted by the judge demonstrated was critical. "The evidence at the [1984] hearings appears to provide clear and convincing proof that the mother was unfit to provide [the children] with the care, affection, nurture, and understanding guidance which [they] require[ ] and to protect [them] from normal hazards. Evidence of her serious inadequacy, despite her good intentions, came from competent observers. . . ."[7] *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. 161, 165 (1983).

There is ample support for the judge's finding that the mother and the father are currently unfit to care for the children. The father has no true desire to have custody of the son, and the mother has shown a "profound incapacity to care for the child[ren]." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. 965, 966 (1983). There was testimony from experts that the children will be at great risk if returned to the mother and father. "Courts need not wait until they are confronted with a maltreated child before deciding that care and protection are necessary." *Custody of Two Minors,* 396 Mass. at 620, citing *Custody of a Minor (No. 1),* 377 Mass. 876, 882-883 (1979).

---

[7] We are not unmindful of the evidence presented by the mother to show that her children could be returned to her safely. However, as earlier noted, the judge found that evidence unpersuasive, and he explained the reasons for his findings. "[T]he judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." *Custody of Two Minors,* 396 Mass. at 618, 620 n.6.

### III. EVIDENTIARY RULINGS.

Although the parents contend that the judge erroneously relied on various reports containing hearsay in making his findings, their argument does not take into consideration the facts that they were the proponents of one of the reports and that the authors of all the reports relied upon by the judge testified at trial and were cross-examined at length by counsel for the parents. See *Duro* v. *Duro,* 392 Mass. 574, 580 n.9 (1984); *Custody of Two Minors,* 19 Mass. App. Ct. 552, 558-559 (1985). The mother's contention that evidence favorable to her was improperly excluded is without force. Although the pediatrician was not allowed to testify in conclusory terms about the mother's reaction upon being told that her daughter had been sexually abused, the pediatrician did state that the mother was "concerned." The error, if any, in excluding "upset" can only be viewed as insignificant. Even assuming that it was error to exclude the report of the probation officer or to allow her to refer to it when she could not remember its contents "verbatim," the probation officcer testified to facts in support of the mother's reunion with the children. As stated in note 7, *supra,* the judge, for the reasons set out in his findings, found that testimony unimpressive.

### IV. ALLEGED BIAS OF THE JUDGE.

Our review of the transcript reveals no bias by the judge against the father. Rather, the judge's questioning of the father was justified and reasonable, considering that although the father opposed the petition he: (1) did not formally acknowledge the son to be his child until the last of the four days of hearing; (2) did not visit with the son with any semblance of regularity; and (3) did not provide any true financial support for him.

### V. COUNSEL FOR THE CHILDREN.

At trial, the judge denied the request of the guardian ad litem that her role be expanded so that she could act as counsel for the children. On appeal, the guardian ad litem, as an amicus curiae, argues that in proceedings involving termination of parental rights, children have a constitutional right to independent counsel. Whether such a right exists has not been deter-

mined. See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 5 n.6 (1979) ("We need not decide whether, or in what circumstances, it might be necessary for the judge to appoint independent counsel for the child").

In her reports to the court, the guardian ad litem made it clear to the judge that she was of the view that the mother's rights should not be terminated and that the children should be reunited with the mother. This was also the position of the mother, who had counsel independent of the father. It was also the course of action desired by the son's father. The guardian ad litem does not argue before us that the evidence in support of this position was not forcefully advanced by counsel for the mother and for the father or that pertinent evidence was not brought forward. Although the guardian ad litem is to be complimented for raising, pursuing, and ably presenting the issue, in view of the circumstances of this case we need not decide whether it was "necessary for the judge to appoint independent counsel for the child[ren]." *Id.*

*Decrees affirmed.*

BROWN, J. (concurring). Mindful of the extreme delicacy and care with which we are required to review petitions to dispense with consent to adopt, I confidently concur in the opinion of the majority. I am, however, troubled by the treatment of these matters by some members of the bar. An attorney, of course, must be a strong and forceful advocate. But often, particularly in custody and adoption cases, untempered advocacy may transcend the bounds of proper professional conduct. Zealous advocacy is commendable; opposition for the sake of opposition is wasteful and unprofessional. See S.J.C. Rule 3:07, DR 1-102(A)(5), as appearing in 382 Mass. 769-770 (1980). Must attorneys always assume an advocacy posture; whatever happened to the counseling aspect of our profession? "Lawyers have an obligation to the public and the profession to decline engagement" for obviously meaningless purposes. *Kennedy* v. *Kennedy,* 20 Mass. App. Ct. 559, 565 (1985) (Brown, J., concurring).

Here, the father's attorney played a role for which there apparently seems to be no legally tenable basis. Nor does the factual record justify the father's intervention as a party. Ordinarily, a party is supposed to have a stake in the outcome of the matter.[1] In this case, however, the father desired neither custody nor visitation. He is even quoted as saying that he effected perfunctory visits with his son only because his "lawyer pointed out that it would be a good idea." This approaches the perpetration of fraud on the court. An attorney's role is not to obscure the true situation or to press foredoomed and bogus claims merely because he represents a client. Such thoughtless practices cause undue delay and "unfairly consume public resources without any corresponding benefit to the administration of justice." Cf. *Commonwealth* v. *Pisa,* 384 Mass. 362, 366 (1981).

In examining the sensitive questions involved in attempting to discern the best interests and welfare of a child, we need neither clutter nor disingenuous arguments.[2] There is too much at stake. A court's compassion and limited resources must be reserved for real cases and genuinely interested parties.

---

[1] The father, of course, has a right to express a preference for the person or persons whom he wishes to have custody of his biological child. Cf. *Freeman* v. *Chaplic,* 388 Mass. 398, 406-409 (1983). Nothing said here should be construed to denigrate such a right.

[2] It is an understatement to say that some of the arguments and evidence developed by the parents strain credulity.