## Custody of a Minor.

Essex. March 7, 1983. — July 22, 1983.

Present: Hennessey, C.J., Wilkins, Liacos, Nolan, & O'Connor, JJ.

*Parent and Child,* Care and protection of minor. *Jurisdiction,* Care and protection of minor. *Minor,* Care and protection, Custody.

When the Department of Social Services in a care and protection proceeding under G. L. c. 119, § 24, filed a motion to withdraw from the case and to substitute as petitioner the person who had been caring for the child in question, and the care and protection petition was ordered dismissed, proceedings in the District Court should have terminated and a trial de novo in the juvenile appeals session on the substituted petitioner's appeal was inappropriate. [761-764]

A custody dispute between a person who had been caring for a child and the child's mother should be resolved in a guardianship proceeding pursuant to G. L. c. 201, § 5, in a Probate and Family Court, rather than by continuation of a care and protection proceeding under G. L. c. 119, §§ 24-26, after withdrawal from the case by the Department of Social Services. [761-762]

Discussion of factors to be considered in reaching a decision to terminate the right of natural parents to the custody of their minor children. [764-770]

Petition filed in the First Essex Division of the District Court Department on June 13, 1980.

The case was heard in the juvenile appeals session by *Furnari,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Thomas Barrett (Sharon M. Parenteau* with him) for the mother.

*Scott A. Smith,* Assistant Attorney General, for Department of Social Services.

*Peter C. DiGangi* for the substituted petitioner.

*Linda E. Giles* for the minor.

O'CONNOR, J.  The mother of a minor child appeals from an April 1, 1981, judgment of a District Court adjudicating her daughter in need of care and protection, awarding physical custody of the child to Brenda C., and awarding legal custody to the Department of Social Services (department).  We reverse the judgment, vacate the custody awards, and order the petition to be dismissed.

On June 13, 1980, the department filed a care and protection petition in the District Court pursuant to G. L. c. 119, § 24, as amended by St. 1978, c. 478, §§ 49 and 50.  On that day, the court issued an emergency order transferring custody of the child to the department, and set June 16, 1980, for a hearing on an extension of that order.  The order transferring custody was extended on June 16, and the case was continued to June 17, 1980.  On August 6, 1980, a motion of the department to withdraw as a "Co-Petitioner" and to substitute Brenda C. as petitioner was allowed.  The back of the petition indicates that on August 13, 1980, the court dismissed the petition, that Brenda C. appealed, and that "Counsel for the child, Linda Giles, also exercise[d] her right of appeal — child to remain in the custody of [the department] pending . . . appeal."

On August 13 the case was transferred to a juvenile appeals session of the District Court, and pretrial hearings and a trial without jury were conducted between late August, 1980, and April 1, 1981.  The trial resulted in the judgment from which this appeal was taken.  A claim of appeal was filed on April 10, 1981.  On January 18, 1982, Brenda C. filed a motion to dismiss the appeal, grounded on the mother's failure to perfect it.  The motion was denied on February 19, 1982, and the record was assembled and transmitted to the Appeals Court on August 4, 1982.  We transferred the appeal to this court on our own motion.

The trial judge made numerous subsidiary findings which he set forth in seventy-three numbered paragraphs.  We paraphrase, and in several instances, quote, the most significant subsidiary findings.  The mother began living on her

own, with a male friend, about 1966, when she was nineteen years old. The child in question was her second child and was born out of wedlock in Virginia on December 18, 1970. A first child had been given up for adoption shortly after birth. The mother lived with the father of the second child from 1968 until eight months after the child was born. In August, 1971, the mother met a university student and one week later she left the child's father and began to live with this student. In 1972 the student graduated and married the mother. They bought a farm and opened a small store. The next two years were productive. However, the mother "became disenchanted with the discipline and attention required for maintaining a business as well as [her] maternal obligations."

In the fall of 1974 the mother and her husband separated. She took full control of the store and it prospered. The mother then "impulsively decided to return to college and obtain the education she had not received earlier." She hired someone to run the store and she drew from the business for the child's and her own support. At the end of 1974 the mother and child went to Findhorn Gardens in Scotland, which was "a communal situation where everyone lives in harmony with nature and she would have some help in raising [the child]." Meanwhile the store was being drained of its resources. Ultimately, the mother's husband was held responsible for debts incurred during that period.

The mother and child spent one month in Findhorn Gardens and then they lived in England, where the mother worked as a waitress until, after a trip to Ireland, they returned to Virginia in the summer of 1975. They moved from place to place until August 1, 1977. During that two-year period the mother "would have relationships with men. The child was exposed to a sexual awareness and [an] adult type relationship by proximity of her physical presence and the mother's passive, casual, careless attitude and conduct."

In December, 1976, the mother and child arrived at Summit Lighthouse in Los Angeles, which was operated by a religious sect. The child was "required to staccato speak

rapidly as possible the sect prayers for [ten] minutes on each hour." The Summit Lighthouse believed in open prayer for the improvement of world conditions. In January, 1977, the mother and child moved to Topanga Canyon, California, where the mother obtained employment at an inn that was owned and operated by the same religious sect. The mother was a steady and responsible employee.

While at the inn the mother met a man who had conceived an idea for a juice factory in Hawaii to be operated by a group on a communal basis. The group would provide food, clothing, housing, and education for children. Brenda C., the substituted petitioner, was a former elementary school teacher and was to provide education to the children. The mother and child went to Hawaii in August, 1977, to take part in the juice factory venture. The mother met Brenda C. and they talked about a school for the child and about the child's temporary care and custody.

While the mother was helping to establish the juice factory, the child lived with Brenda C. and attended public school. The factory project faltered, and the mother left it. She met a man, whose wife had left him. In January, 1978, she went to his home, which was about fifty miles from Brenda C.'s home, and kept house and cared for his two and one-half year old child. In the meanwhile, the mother's child attended school and Brenda C. cared for her. The mother visited on occasional weekends.

In May, 1978, the factory began to operate. The mother rejoined the group that was operating the factory and lived in a warehouse. She lived with a man for two years. She was upset when this relationship did not ripen into marriage. The mother acceded to this man's wishes that the child not live with them, and Brenda C. continued to care for the child. The child continued to attend school. After six months the factory closed and the mother and the man pruned trees, gardened, and painted to make a living while moving from place to place in Hawaii.

"[The mother] is a vegetarian, and would bring [the child] up as one. She does not herself nor would she allow [the

child] to eat meat or dairy products, but would allow some fish. She is steadfast in this theory.

"[The mother] does not subscribe to regular and traditional medical practices and procedure. If there is any possible subjective alternative to recognized medical procedures she would opt for that choice. She subscribed to a holistic type of medicine. Here too, she is steadfast in her singular subjective beliefs.

"While [the mother] testified she suffered from various ailments which she claims on occasion disabled her from activities, however, she did not seek the assistance or advice of medical doctors. At most she would on rare occasions visit a chiropractic for manipulation of the bones to achieve relief. However it did not prevent her from . . . indulging in health type exercises and sexual relationships with men on an open on going basis.

"Until the time [the child] came to live with Brenda she and her mother would share the same bed. Whenever [the mother] had a relationship with a male [the child] would be transferred to a different sleeping place. [The child] viewed these occasions as rejection by her mother and created an inner resentment which she still harbors."

In the summer of 1978 Brenda C. took the child to California for a visit. This was with the mother's consent. At the end of the summer, also with the mother's consent, Brenda C. and the child moved to New Hampshire due to the terminal illness of Brenda C.'s father. Brenda C. taught, and the child attended school. The mother executed forms which were required in New Hampshire, giving Brenda C. the power to act in the mother's place in matters concerning the child's education and welfare.

"Brenda's father died in 1979 and at the conclusion of the school year in New Hampshire she moved back to Salem, Mass., into her family home. [The child] for the first time in her almost nine years found herself in the comfort, protection, care and security of a middle class family home." The child attended public school in Salem up to and including the time of trial.

The mother and Brenda C. communicated regularly by mail until June, 1980. The mother expressed her confidence in Brenda C.'s ability to care for the child, and from time to time she admitted her own inadequacy in that regard.

The mother visited Salem in April, 1980, and at that time she reaffirmed her confidence in Brenda C. as caretaker of the child. While in Salem the mother planned a summer trip to Hawaii for the child. Subsequently, the mother sent Brenda C. a prepaid airplane ticket for the child's use on June 13, 1980. The child did not want to go. On that day, as Brenda C. was leaving her home for school with the child, the mother and the mother's brother appeared and demanded that Brenda C. give the child to them. The police were called and the mother and her brother retained legal counsel.

The judge found that as a result of her visit to Salem in April the mother became aware of the warmth, stability, and harmony of Brenda C.'s home, and she recognized that the child was happy and involved in healthy activities. It became clear to the mother that "she no longer had a hold over her own child. [The mother] believe[d] she [knew] better how [the child] should be raised. [The mother] believe[d] there must be a change. In her first presentation of fitness to be a parent she indicated that she would return to Hawaii and a single bedroom apartment. Her support income would be from family babysitting.

"Once [the mother] became involved in the appeal process of this case she changed her vocation, her lifestyle and her residence. [She] provided evidence that she and her brother (now divorced) [then had] a 3 bedroom apartment in the Weston [sic], Virginia area, a residence suburb of Washington, D.C. [The mother was then making] $15,000 as a secretary on an outside contract with a temporary placement firm. She [was] employed . . . [and had been employed] on a more or less regular basis for . . . several months."

The judge found that the child is extraordinarily intelligent and mature, and that she unequivocally and adamantly wished to remain with Brenda C.

In early 1980 the child began counselling at the mental health clinic of North Shore Children's Hospital. The judge reported that two counsellors testified that because of the child's fear of abandonment and her need for family stability the child's wishes to remain with Brenda C. "should be respected." The judge found that the child "is in need of continued professional counselling at the North Shore Children's Hospital because of the resentment at being rejected by her natural mother during their travel years," and that the case had "caused further resentment and anxiety due to the mother's request for [the child's] return and [the child's] fear of returning to a lifestyle and discipline she dread[ed]."

We turn now to discussion of the procedure followed in the District Court. We begin by noting that there was no objection in the District Court to the procedure followed, and that the appellants do not now question either the propriety of Brenda C.'s substitution as petitioner or whether the petitioners were entitled to a de novo appeal from the dismissal of the petition. Nevertheless, we address those matters because our conclusion that the procedure was incorrect bears on the action we take in this case.

The judge had authority to transfer custody of the child to the department on an emergency basis on June 13, 1980, and to set a date for a hearing on possible extension of that order. G. L. c. 119, § 24. He also had authority to extend the custody order on June 16. We assume that the order entered on June 16 was to remain in effect until further order of the court. However, when the motion of the department to withdraw was allowed on August 6, the petition should have been dismissed and the judge's order should have been vacated. The issue whether Brenda C. or the mother should have custody of the child would then have been appropriately litigated in the Probate and Family Court as a result of a guardianship petition pursuant to G. L. c. 201, § 5. We do not know whether the motion of the department to withdraw as petitioner was oral or written, and the record does not disclose either the grounds of the motion or the judge's reason for allowing it. However, it is a fair inference from

the fact that the department no longer wished to proceed, and from the oral argument and brief of the department supporting the mother's appeal in this court, that the department had determined by August 6 that the child was not in need of care and protection. Also, it is uncontroverted that the child was in Brenda C.'s care on that date, that she had been in Brenda C.'s care since 1977, and that she remained in Brenda C.'s care thereafter. Brenda C.'s allegations, as substitute petitioner, that the child was without care and protection, were inconsistent with her claim that she was providing the care that the child needed. Brenda C.'s position was not that the child was then in need of care and protection and that the Commonwealth should remove the child from a harmful situation, as is contemplated by G. L. c. 119, § 24, *Custody of a Minor (No. 3),* 378 Mass. 732, 744 (1979), *Custody of a Minor (No. 1),* 377 Mass. 876, 881 (1979), but rather her contention was that the custody she had in fact been exercising should be legally sanctioned. The custody dispute was a proper subject of guardianship proceedings in the Probate and Family Court but it was not the proper subject of a care and protection proceeding.

Incorrect procedure is also demonstrated by a consideration of the procedural events of August 13 and thereafter in the light of G. L. c. 119, §§ 25-27. General Laws c. 119, § 25, provides that when the child has been brought before the court, the court may then hear the petition (on the merits) or fix a time for hearing. General Laws c. 119, § 26, as amended through St. 1978, c. 552, § 29, provides that after summonses and notice have been properly served, and an investigative report has been received, the court shall hear evidence and "[i]f the court finds the allegations in the petition proved . . . it may adjudge that said child is in need of care and protection . . . ." General Laws c. 119, § 27, as amended through St. 1978, c. 478, § 51, provides that "[t]he child, parent, guardian or person appearing in behalf of such child, or the department, may appeal from the adjudication of the court to the juvenile appeals session of the district courts for the county where the hearing is held . . .; and

also may appeal at the time of the order of commitment, in which events the entire case shall be before the court as if originally commenced therein . . . ."[1]

General Laws c. 119, § 27, did not provide for a de novo appeal unless there had been a prior "adjudication." The word "adjudication" implies a determination that the child either is, or is not, in need of care and protection. *Custody of a Minor (No. 2)*, 386 Mass. 460, 463 (1982). *Custody of a Minor (No. 1)*, 13 Mass. App. Ct. 66, 68 (1982). No determination relative to the child's need of care and protection had been made when Brenda C. and the child purported to exercise rights of appeal. The petition had been dismissed. Nothing in the record suggests that there was an evidentiary hearing or that findings were made at that time. Furthermore, counsel for Brenda C. informed this court at oral argument that he entered the case after the care and protection petition had been filed, that he had contemplated filing a petition for guardianship in the Probate and Family Court but was told that he could not do so while the care and protection petition was pending, and that, as a consequence, he requested dismissal of the care and protection petition. He also informed us that he had been concerned that the mother might remove the child from the Commonwealth, so he requested the judge to permit an appeal in order that the earlier commitment to the department would remain in effect during the pendency of the guardianship proceedings. Counsel advised this court that he subsequently discovered that he could not file a guardianship petition due to the pendency of the care and protection appeal, so he proceeded with the appeal in the District Court. We note that the trial judge found that "Brenda has attempted to obtain legal guardianship with custody of [the child] through the Essex Probate and Family Court. However, said court has refused to act, because of the instant action." We conclude,

---

[1] General Laws c. 119, § 27, was amended through St. 1981, c. 715, § 1, and now provides that an appeal from the findings and order of the trial judge in a care and protection case should be to the Appeals Court. The proceedings in this case were not affected by that amendment.

therefore, that the dismissal of the petition on August 13, as well as the earlier withdrawal of the department as petitioner, was not in any sense an "adjudication" and it should have resulted in a termination of the District Court proceedings. The subsequent trial was inappropriate.

Unless proceedings involving the custody of a minor are expedited, they fail to accomplish their purpose. Circumstances may change rapidly, and the harm sought to be avoided may worsen with the passage of time. Here, the child was nine years old when the petition was filed. She is now twelve years old. Prompt resolution of custody issues is essential.[2] It is arguable that due to that consideration we should ignore the procedural infirmities in the District Court and decide the substantive issue on its merits. However, the judge's findings do not enable us to do so because they were made two years ago and because of other inadequacies which we discuss below.

The Legislature has declared that the policy of this Commonwealth is "to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide sub-

---

[2] This case presents a striking example of the need for streamlining legal procedures in order to assure speed in the disposition of cases involving children. Cf. *Adoption of a Minor*, 386 Mass. 741 (1982).

The judges of the Probate, Juvenile, and District Courts have sponsored House Bill No. 4549, now pending in the Senate. That bill would amend G. L. c. 210, § 3, to permit the speedy disposition of cases involving care and protection, guardians, and adoption, by having one judge dispose of all issues as part of a single proceeding.

A proposed court rule will expedite this process by requiring the disclosure by affidavit of all proceedings involving the care and custody of the child which have been commenced or concluded in any domestic or foreign court. The rule is designed to make each court aware of the involvement of other courts in order to avoid potential conflicting orders and to identify those cases where interdepartmental judicial assignments, under the authority of the Chief Administrative Justice, may be appropriate.

No cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children. Resolution of the jurisdictional issues, as discussed above, protects against only one aspect of unnecessary delay that may occur in these cases.

stitute care of children only when the family itself or the re-
sources available to the family are unable to provide the
necessary care and protection to insure the rights of any
child to sound health and normal physical, mental, spiritual
and moral development." G. L. c. 119, § 1, as amended by
St. 1972, c. 785, § 5. See *Custody of a Minor (No. 1)*, 377
Mass. 876, 882 n.5 (1979).

Also, parents have a natural right to the custody of their
children. *Petition of the Dep't of Pub. Welfare to Dispense
with Consent to Adoption*, 383 Mass. 573, 587 (1981).
However, the parents' right to custody is not absolute, and
it must yield to the welfare of the child. *Id.* at 588. *De-
partment of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 5 (1979).
*Custody of a Minor (No. 1), supra* at 881. In furtherance of
the policy of the Commonwealth, and recognizing that
parents have a natural right of custody and children need
care and protection, we have adopted the principle that
parental unfitness must be persuasively shown in order to
justify removal of a child from the custody of its parent.
*Petition of the Dep't of Pub. Welfare to Dispense with Con-
sent to Adoption, supra* at 592, citing *Custody of a Minor
(No. 1), supra* at 886. "[T]he unfitness standard must be
applied whenever the State seeks to terminate parents'
rights to the custody of their minor children, whether the
State proceeds under the care and protection statute (G. L.
c. 119, §§ 23-29), the guardianship statute (G. L. c. 201,
§ 5), or the adoption statute (G. L. c. 210, § 3)." *Petition of
the Dep't of Pub. Welfare to Dispense with Consent to
Adoption, supra* at 589. Custody is not to be transferred
from the natural parent simply because another prospective
custodian is thought to be better qualified. A comparison of
the advantage the prospective custodian may offer to the
child with those that may be offered by the natural parents
is inappropriate. See *Petition of the New England Home
for Little Wanderers to Dispense with Consent to Adoption*,
367 Mass. 631, 640 (1975). "State intervention in the par-
ent-child relationship is justified only when parents appear
unable to provide for their children's care and protection."

*Custody of a Minor (No. 1), supra* at 882. In that sense, the fitness of parents and the best interests of the child are related. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 592. *Bezio* v. *Patenaude*, 381 Mass. 563, 576-577 (1980). *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 641. "[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 589.

"At common law it was presumed that a child's welfare is best served in the care and custody of its parents," *id.* at 587, but that is not the case if the parents " 'have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard' or '[if] some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents [or custodian] indicate[s] that the child would be hurt by being returned to the natural parents.' " *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 590, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 639, 646. "Clearly, under the test our cases articulate, the State may not deprive parents of the custody of their children merely because they are poor and cannot offer the child certain material advantages, or because they choose or suffer an unusual life style. It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered child. Rather, it is the fact of the endangerment itself. As parens patriae the State does not act to punish misbehaving parents; rather it acts to protect endangered children." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 591-592. See *Freeman* v. *Chaplic*, 388 Mass. 398, 405 (1983).

Evidence that is at least "clear and convincing" is constitutionally required for a finding of parental unfitness. *Santosky* v. *Kramer*, 455 U.S. 745, 769-770 (1982). See *Custody*

*of a Minor (No. 2),* 16 Mass. App. Ct. 923, 924 (1983); *Custody of a Minor (No. 2),* 13 Mass. App. Ct. 1088 (1982). Also, the removal of a child from the custody of his or her parents may be ordered only upon a demonstration by specific and detailed findings that the welfare of the child makes removal necessary. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 592. *Custody of a Minor (No. 1),* 377 Mass. 876, 885-886 (1979). The judge's findings must support his or her conclusions and order, and it must be clear that the order was not motivated by inappropriate factors. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 593. See *Freeman* v. *Chaplic, supra* at 404-405; *Custody of a Minor (No. 2),* 378 Mass. 712, 714, 720-721 (1979).

The judge made several findings and observations (stated as conclusions), which suggest that his order may have been motivated by inappropriate factors and that he may have incorrectly applied the parental unfitness standard. The judge found that the mother "believes she knows better how the daughter should be raised," implying that her belief was incorrect, and that "to return [the child] to her mother at a time when she is receiving excellent care and custodial maintenance . . . would be outside the jurisdiction of this court." He observed that "[a] natural mother does not by virtue of pregnancy and birth acquire a vested right to determine subjectively at her convenience what course of growth development and education of the minor child [there] should be." These findings and observations at least suggest an inappropriate comparison of the advantages that Brenda C. offers to the child with those offered by the mother, and do not clearly recognize the mother's presumptive right to raise the child as she sees fit.

The judge's disapproval of the mother's life-style appears to have been an important factor in his decision. His focus on the mother's unconventional behavior, including her frequent moves from place to place, her unusual residences, unorthodox religion, vegetarianism, adherence to holistic medicine, communal living, and nonmarital cohabitation

with men, casts doubt on whether he gave sufficient recognition to the principle that "[t]he State may not deprive parents of custody of their children . . . simply because the parents embrace ideologies or pursue life-styles at odds with the average." *Bezio* v. *Patenaude,* 381 Mass. 563, 579 (1980), citing *Custody of a Minor (No. 2), supra* at 719. Although the judge found that the child experienced a sense of rejection on occasion, and therefore she harbored a continuing resentment, there are no findings concerning what, if any, significant physical, mental, or emotional deficits were suffered by the child as a result of the mother's way of life.

It appears, also, that the judge gave considerable weight to the fact that the mother voluntarily placed the child in Brenda C.'s care and consented to the continuation of that arrangement for two and one-half years. However, parents do not relinquish their right to custody by choosing a caretaker proxy. *Freeman* v. *Chaplic, supra* at 407. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 583. *Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 640 (1975). We recognize that the lengthy separation of a mother and child and a corresponding growth in the ties between the child and a different custodian may in some circumstances indicate that the forced return of the child to the mother would be seriously detrimental to the child, with the result that the mother should be deemed not fit to care for the child. *Petition of the Dep't of Pub. Welfure to Dispense with Consent to Adoption, supra* at 590. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 639. The judge's conclusions from his subsidiary findings state that "[t]he sudden cleavage of a bonded relationship lasting over three years between a surrogate mother and the minor child of tender years, where the child has achieved for the first time, a stable, loving and devoted relationship could and would cause irreparable harm and injury to the growth, development and education of the minor child." The subsidiary findings do not warrant the conclusion that

in this case separation of the child and the "surrogate mother" would cause irreparable harm to the child.

The judge's findings and some of the observations included in his conclusions suggest that he may have given inappropriate weight to the child's wishes. The judge observed that "[a] minor child whose maturity age exceeds that of those under the statutory law endowing them a right of selection of parents or guardians should not be denied her true wishes and desires especially where her initial life period was so unstable and lacking of parenting skills and ability. . . . The minor child has a valid and enforceable right and interest in determining the direction of her future life especially where her circumstances from birth to date were as they were in this case and she should not be compelled to revert to a life for which she obviously has a [distaste] and aversion." "[I]t has long been the law of Massachusetts that the preferences of children of sufficient maturity may be considered" and even given "great weight." *Custody of a Minor*, 383 Mass. 595, 602 (1981). The wishes of an unusually bright ten year old child are appropriately considered. However, they are not controlling. The controlling question is whether the welfare of this child would be seriously endangered if custody is not transferred from the mother. There are insufficient detailed and specific findings to show persuasively that it would.

The judge stated that he was "not convinced that [the mother] is ostensibly currently fit to act as a parent," that her "current life style is not merely a facade," or that her "life style, dietary habits, subjective philosophical beliefs and general history of impulsive behavior is in the best interest of this child," and that he was not "convinced that the mother has the long term commitment to raise the child properly to adulthood." Even if the judge did not incorrectly shift the burden of proof from the petitioner to the mother, which the mother argues he did, these findings and conclusions indicate that the order may have been based on inappropriate considerations. Furthermore, "[a]s there has been a substantial passage of time since the last hearing in

this matter and the circumstances of the parties may have changed, the parties [must] be given an opportunity to present new evidence." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 593-594. *Bezio* v. *Patenaude, supra* at 579. Since no interest would be served by remanding this case to the District Court for further proceedings under G. L. c. 119, § 26, which we have determined to be an inappropriate procedure for resolving this custody dispute, we reverse the judgment of the District Court, vacate the order awarding physical custody of the minor to Brenda C. and legal custody to the department, and we order the petition dismissed. The custody issue may be resolved by expedited proceedings in the Probate and Family Court under G. L. c. 201, §§ 2, 5.[3]

*So ordered.*

---

[3] Our disposition of this case makes it unnecessary for us to address issues raised by the mother with respect to the constitutionality of G. L. c. 119, §§ 24-26 (see *Custody of a Minor [No. 2]*, 378 Mass. 712, 716-719 [1979]), the sufficiency of the evidence to warrant the judge's subsidiary findings, or the standard of proof.