NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

20-P-4                                         Appeals Court

ADOPTION OF JACOB.[1]


No. 20-P-4.

Bristol.     October 22, 2020. - March 1, 2021.

Present:  Massing, Singh, & Grant, JJ.


Adoption, Care and protection, Dispensing with parent's consent,
     Foster parents, Standing.  Parent and Child, Care and
     protection of minor, Dispensing with parent's consent to
     adoption, Custody.  Minor, Care and protection, Adoption.
     Grandparent.  Department of Children & Families.  Practice,
     Civil, Care and protection proceeding, Adoption,
     Guardianship proceeding, Sequestration of witness.



     Petitions filed in the Bristol County Division of the
Juvenile Court Department on June 2, 2017, and September 25,
2018.

     The cases were heard by Tracie L. Souza, J.


     Cara M. Cheyette for the mother.
     William A. Comeau for the father.
     Andrew Don for the grandparents.
     Charles G. Levin for the child.
     Brian Pariser for Department of Children and Families.

---

     [1] A pseudonym.

MASSING, J.  This multiparty appeal arises from a petition for care and protection that was tried in the Juvenile Court together with a petition for guardianship.  The guardianship petitioners, the child's paternal grandparents (grandparents), had temporary custody of the child when the trial began.  The judge found the child's mother and father to be unfit and that the child's best interests would be served by terminating their parental rights and allowing the Department of Children and Families (department) to go forward with its plan for adoption by recruitment, rather than permitting the child to remain with the grandparents.  The primary issues on appeal concern the judge's consideration of domestic violence in assessing the mother's fitness, the grandparents' exclusion from portions of the trial, and the suitability of the department's permanency plan.  We affirm.

Background.  Even before the child's birth, the mother and the father, both individually and as a couple, faced significant issues that would affect their fitness as parents.  The mother struggled with her mental health, having been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, posttraumatic stress disorder resulting from a sexual assault and robbery, borderline personality disorder, and severe generalized anxiety disorder.  Although she engaged in some mental health treatment, including counseling, she frequently

misused her prescribed medications, and she "self-medicated" with alcohol and nonprescribed substances, both while she was pregnant and throughout the pendency of the care and protection petition.

The father faced similar mental health challenges, exacerbated by a history of physical injuries from his participation in extreme sports and numerous motor vehicle accidents. To treat both his mental and physical conditions, the father was prescribed medication, including opiates, which he misused. He also shared medications with the mother. The record is replete with evidence of the father's manic behavior and disorganized thinking, suggesting undiagnosed mental health conditions. Both parents had difficulty complying with the department's family action plan tasks.

In addition, the couple's relationship was fraught with conflict. The father abused the mother verbally, emotionally, and, on a few occasions, physically. The mother made excuses for the father's conduct and was unwilling or unable to separate from him. The grandparents, for their part, minimized the father's abuse of the mother and the extent of his mental health problems, failing to recognize the danger these issues posed to the child's safety and well-being.

The child, Jacob, was born in May 2017 with a low birthweight and tetrahydrocannabinol in his urine. The mother

had tested positive for morphine and Klonopin during her pregnancy.[2] Although Jacob was discharged into his parents' custody, the hospital filed a report pursuant to G. L. c. 119, § 51A, citing concerns about Jacob's substance exposure. The department conducted a home visit one day after Jacob was discharged from the hospital. Later that same day, the department sought emergency temporary custody of Jacob after the parents arrived, apparently intoxicated, over an hour late to an appointment with Jacob's pediatrician. Jacob, who was seven days old, was removed from his parents' custody and placed temporarily in the custody of the department. The grandparents applied to serve as Jacob's foster parents in June 2017, but they did not meet eligibility requirements because they kept unsecured firearms in their home. After Jacob spent six months in foster care, the judge awarded temporary custody to the grandparents pursuant to a stipulated third-party conditional custody agreement. The department soon changed its permanency goal from reunification with the parents to adoption.

Jacob was nearly sixteen months old when the trial on the care and protection petition began. The grandparents filed a

---

[2] The department later obtained the mother's urine screen results from the period of her pregnancy. Those results were positive for numerous substances, including oxycodone, morphine, amphetamines, and antidepressants; she had prescriptions only for Prozac and Ativan.

guardianship petition shortly before the trial.  The two matters were tried together, but not formally consolidated, on sixteen nonconsecutive days over a four-month period.  On the third day of trial, after concerns were raised about the grandfather's conduct in the court room, the judge allowed the department's motion to sequester witnesses, thereby excluding the grandparents from the care and protection proceedings.  They were to be allowed back into the court room for proceedings on their guardianship petition.[3]  Evidence elicited early in the trial suggested that the grandparents had violated the terms of the conditional custody agreement by permitting the father and the mother to have unauthorized contact with Jacob.  As a result, the department moved, midtrial, to revoke the grandparents' custody.  The judge took no action on the motion at the time of trial but modified the custody order to require that all visits take place at a visitation center.[4]

On March 26, 2019, the judge found that both the mother and the father were unfit, terminated their parental rights,

---

[3] We discuss the grandparents' presence and participation in the trial in detail below.

[4] The grandparents did not comply with the judge's revised order, and the judge suggested that a contempt hearing would be necessary.  The record does not reflect that a contempt hearing was held, and no judgment of contempt was issued, although the judge did make a finding that the father's and the grandparents' actions "constitute[d] contempt of the [c]ourt's [o]rder."

adjudicated Jacob in need of care and protection, and committed him to the custody of the department. The judge further found the department's plan of adoption by recruitment to be in Jacob's best interests, rejecting the competing plans proposed by the mother, the father, and Jacob, all of which involved Jacob remaining in the grandparents' care. The judge dismissed the grandparents' guardianship petition and revoked their temporary custody of Jacob. These appeals followed.

Discussion. The appellants and arguments in this appeal are numerous. The mother contends that the judge erred in finding her unfit and terminating her parental rights based on evidence of domestic violence, substance use, and mental health issues. The grandparents, joined by the father, the mother, and Jacob, appeal from the denial of their guardianship petition, contending that the judge erred in excluding them from the court room during portions of the proceedings and that their exclusion requires a new trial without a showing of prejudice.[5] The father and Jacob argue that the department's proposed plan of adoption

---

[5] We assume without deciding that Jacob has standing to appeal from the denial of the grandparents' guardianship petition. See Guardianship of Tara, 97 Mass. App. Ct. 11, 12 n.4 (2020), citing Matter of Angela, 445 Mass. 55, 62 (2005) ("Although the statute's explicit grant of party status to a child is limited to one at least fourteen years old, G. L. c. 190B, § 5-206 [b] [1], it appears that this right extends to a younger child represented by counsel or a guardian ad litem").

by recruitment was inadequate, and that the judge erred in rejecting their competing plans of guardianship or adoption by the grandparents.[6]

1.  Termination of the mother's parental rights.[7]  Before terminating parental rights, a judge must find that a parent is unfit to care for the child and, consequently, that the child is in need of care and protection.  See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018).  The judge's fitness determination must be supported by "specific and detailed" findings that demonstrate parental unfitness clearly and convincingly.  Custody of Eleanor, 414 Mass. 795, 799 (1993).  "'[P]arental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'"  Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975).  In ascertaining parental fitness, the judge "may consider past conduct to predict future ability and performance."  Adoption of Katharine, supra at 32-33.

---

[6] Although the grandparents purport to join the father and Jacob in arguing that the department's adoption plan was inadequate, they were not parties to the care and protection proceedings and, therefore, do not have standing to appeal from that aspect of the decision.

[7] The father does not challenge the judge's finding that he was unfit or the termination of his parental rights.

a. Domestic violence. Domestic violence may imperil a child's physical safety and psychological development. See Custody of Vaughn, 422 Mass. 590, 599 (1996); Adoption of Ramon, 41 Mass. App. Ct. 709, 714 (1996). Accordingly, evidence of domestic violence is relevant to a judge's determination of parental fitness. See Care & Protection of Lillith, 61 Mass. App. Ct. 132, 139 (2004). Where the evidence raises concerns regarding domestic violence, a judge must "make detailed and comprehensive findings on domestic violence when making custody determinations." Id., citing Custody of Vaughn, supra at 599.

The judge found that domestic violence "permeated" the mother's relationship with the father. The mother asserts that the father's behavior was not sufficiently severe to factor into the judge's consideration of her fitness as a parent, particularly if viewed under the standards that apply to evidence of domestic violence in private custody disputes.

In private child custody disputes, the rights of the parents are, "in the absence of misconduct, . . . held to be equal." G. L. c. 208, § 31. The determination whether to award shared legal or physical custody, or whether to give one parent sole legal or physical custody, thus turns entirely on "the happiness and welfare of the children." Id. There is "no presumption either in favor of or against shared" custody, id. -- unless the judge finds by a preponderance of the evidence

that one parent has engaged in "a pattern of abuse," or a single "serious incident of abuse,"[8] in which case a rebuttable presumption against granting custody to the abusive parent arises. G. L. c. 208, § 31A. See Malachi M. v. Quintina Q., 483 Mass. 725, 737-738 (2019). Although the Legislature has not seen fit to superimpose the procedures and presumptions of § 31A on care and protection or termination of parental rights proceedings, the mother suggests that this court should do so -- and hold that the evidence of domestic violence in this case was insufficient to create a presumption against custody under G. L. c. 208, § 31A. We decline the invitation.

Different standards apply to private custody disputes than apply to State-involved custody proceedings for good reason. Resolving a private custody dispute involves comparing the advantages each parent may offer the child. When the State intervenes in matters of custody, however, a comparison between

---

[8] "Abuse" is defined as "the occurrence of one or more of the following acts between a parent and the other parent or between a parent and child: (a) attempting to cause or causing bodily injury; or (b) placing another in reasonable fear of imminent bodily injury." G. L. c. 208, § 31A. A "[s]erious incident of abuse" is "the occurrence of one or more of the following acts between a parent and the other parent or between a parent and child: (a) attempting to cause or causing serious bodily injury; (b) placing another in reasonable fear of imminent serious bodily injury; or (c) causing another to engage involuntarily in sexual relations by force, threat or duress." Id.

the parents, or "comparison of the advantage [a] prospective custodian may offer to the child with those that may be offered by the natural parents is inappropriate." Custody of a Minor, 389 Mass. 755, 765 (1983). See Guardianship of Estelle, 70 Mass. App. Ct. 575, 580 (2007) ("we do not transfer a child from his or her parent to other custodians merely because the latter may provide a more advantageous environment for the child's upbringing"). Moreover, in private custody disputes the parents usually have agreed to separate, whereas in State-involved proceedings, it is often the case that a parent has not resolved to leave an abusive relationship, thereby exposing the child to domestic violence.

Also, unlike private custody disputes, which concentrate entirely on the interests of the child, care and protection proceedings begin with a focus on the rights of the parents and a strong presumption in favor of parental custody. See Santosky v. Kramer, 455 U.S. 745, 753-754 (1982); Adoption of Frederick, 405 Mass. 1, 4 (1989); C.P. Kindregan, Jr., M. McBrien, & P.A. Kindregan, Family Law and Practice § 61:1 (4th ed. 2013). Accordingly, the State must prove parental unfitness by clear and convincing evidence, and the burden of proof always remains with the department. See Care & Protection of Erin, 443 Mass. 567, 570-571 (2005); Care & Protection of Laura, 414 Mass. 788, 790-791 (1993).

Finally, while evidence of spousal or child abuse may be dispositive in a private custody dispute under G. L. c. 208, § 31A, in care and protection and termination proceedings it is one of many factors that the judge considers.  See G. L. c. 210, § 3 (c).  Domestic violence "is only one of many 'subsidiary facts' on which a judge must make findings in deciding the ultimate question of parental unfitness."  Care & Protection of Laura, 414 Mass. at 794.  No one factor is determinative.  See Care & Protection of Yetta, 84 Mass. App. Ct. 691, 695 (2014).

The evidence in this case supported the judge's reliance on domestic violence as a significant factor in deeming the mother unfit.  The instances of serious physical abuse may have been few,[9] but there was ample evidence of the father's manic, controlling, threatening, and unpredictable behavior toward the mother.  The father verbally abused her constantly, slapped her, blocked doors during arguments to prevent her from leaving, and confiscated her cell phone and other belongings.  The mother testified about the emotional toll the father's behavior had on

---

[9] On one occasion before Jacob was born, the father grabbed the mother by the arms so hard that the police, responding to the scene, observed black and blue marks on the mother's upper arms.  The father was arrested for domestic assault and battery, but the complaint was dismissed when the mother refused to press charges.  In another incident, when the mother was pregnant, the father, who was intoxicated, locked his arms around her so tightly that she was in fear and bit him.  This incident resulted in the mother's arrest.

her[10] and about her fears that Jacob would "be exposed to what [she] was exposed to."

The evidence also supported the judge's finding that the mother exhibited a "dependency and inability to separate from [the f]ather," and that "despite [her] participation in counseling and domestic violence services, she [did] not have the capacity or the desire to end her relationship" with him.  A judge may properly consider a parent's decision to remain in a relationship with an abusive partner in determining parental fitness.  See Adoption of Willow, 433 Mass. 636, 645 (2001); Adoption of Lisette, 93 Mass. App. Ct. 284, 293-294 & n.15 (2018).  The mother testified variously that she meant to end her relationship with the father for Jacob's well-being, and that she hoped to marry the father "if we go to couple's counseling, in a couple years," because she wanted Jacob "to have both of his parents."  The judge found it telling that the mother and the father had stayed in a motel together the night before the last day of trial.

b.  Substance use and mental health.  The mother asserts that the judge improperly relied on her substance use and mental health issues in finding her unfit.  "When assessing parental

_____

[10] The father's conduct made the mother feel "insane":  "I start rocking back and forth and like having a panic attack and like begging him to stop. . . .  [L]ike he triggers my innermost insecurities."

fitness, it is not enough to state that a parent is mentally impaired, rather there must be a showing that the condition affects the parent's ability to care for the child." Adoption of Quentin, 424 Mass. 882, 888 (1997). Thus, a parent's mental health "is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. at 9. Likewise, a parent's substance use or misuse "clearly is relevant to a parent's willingness, competence, and availability to provide care, though not necessarily dispositive of the issue." Care & Protection of Frank, 409 Mass. 492, 494 (1991).

The record supports the judge's findings that the mother's failure to address her numerous mental health issues and her misuse of prescribed and nonprescribed substances interfered with her ability to assume parental responsibilities. The mother's difficulties in managing her emotions and stress, as well as her history with alcohol and nonprescribed substances, including Xanax prescribed to her grandmother and morphine prescribed to the father, affected her ability to care for Jacob. The judge was troubled by evidence that the mother took extra doses of Xanax and shots of alcohol before two visits with Jacob, and by her appearance of being under the influence of alcohol or drugs during trial on a day she had driven herself to

court.  The judge was particularly concerned by an incident disclosed for the first time during the trial (which had never been disclosed to the department) in which the mother, contemplating suicide, took a gun from her grandparents' home, went into the woods, and fired it.  Although the mother had taken some steps to comply with the department's family action plan with respect to her substance use and mental health treatment, these efforts began only shortly before trial.

c.  Best interests determination.  The judge's factual findings and conclusions with respect to the mother's issues of domestic violence, mental health, and substance use demonstrated careful attention to the evidence and the law.  See Adoption of Nancy, 443 Mass. 512, 515 (2005).  In effect, the mother's arguments amount to dissatisfaction with the judge's weighing of the evidence.  We, however, afford deference to the judge's assessment of the weight of the evidence and the credibility of the witnesses, as well as to the judge's determination of the child's best interests, reversing only if there is clear error or abuse of discretion.  See Adoption of Larry, 434 Mass. 456, 462 (2001); Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999); Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012).  The evidence was clear and convincing that the mother was unfit to parent Jacob and likely to remain so.

2. <u>Exclusion of the grandparents from parts of the trial</u>. The grandparents contend that they were wrongly excluded from parts of the care and protection proceedings, and that their exclusion violated their right to a fair trial on their guardianship petition.[11] Having carefully reviewed the parties' arguments and the voluminous trial transcript, we discern no abuse of discretion or reversible error in the judge's handling of the trial.

a. <u>Grandparents' presence and participation</u>. On the first day of trial, the mother moved to sequester the witnesses, noting that the grandfather was present in the court room. The judge denied the request, stating, "[H]e's the placement so I'm going to allow him to stay." The father was the first witness to testify. During his testimony, the judge interrupted to admonish the grandfather for shaking his head "up and down or side to side" while the father testified.

On the third day of trial, during the mother's testimony, counsel for the department and counsel for the mother alerted

---

[11] The father, the mother, and Jacob all join in this argument in their briefs, although at trial the mother and Jacob agreed with the judge that the grandparents should not be present during the care and protection proceedings. We reject Jacob's further argument that the grandparents' exclusion violated <u>his</u> due process rights. Jacob was represented by counsel, who advocated ably on his behalf, with undivided loyalty, throughout the proceedings. Contrast <u>Adoption of Flora</u>, 60 Mass. App. Ct. 334, 339-340 (2004).

the judge that the grandfather had been taking "voluminous" notes throughout the closed proceedings.[12]  They also argued that his presence during the testimony of the mother and the anticipated testimony of the mother's aunt (aunt) -- another potential guardian -- might affect the witnesses' candor on the stand and jeopardize subsequent relations among the parties. The department moved to sequester the witnesses.  With only counsel for the father objecting, the judge allowed the motion and asked the grandfather to leave the court room and surrender his notes.  At the end of the day, the grandfather was invited back into the court room to discuss scheduling of the proceedings on the guardianship petition.  The grandfather asked for and received assurances that the guardianship petition would not be heard until after the termination proceedings had concluded.

The grandparents were not present for the fourth or fifth days of trial, when the mother's testimony continued and the aunt's testimony began.  On the sixth day of trial, an attorney appeared on behalf of the grandparents.  The judge told the attorney that he could be present for any testimony concerning proposed guardians, including the continued testimony of the

---

[12] Care and protection matters are closed to the public. See G. L. c. 119, § 38.

aunt at the next trial date; the attorney stated that he was available to attend.[13]

Nonetheless, the grandparents' attorney was not present for the seventh, eight, or ninth trial dates, during which the mother, the aunt, and a department case worker testified. On the tenth day of trial, the department called its adoption social worker, who would testify about the department's position with respect to the grandparents' proposed guardianship. Because the grandparents' attorney was not available, the judge permitted the grandmother to remain in the court room for this testimony.[14] From that point on, at least one grandparent, their attorney, or both were present, and the attorney, when present, was permitted to cross-examine witnesses.

b. Grandparents' rights. As an initial matter, the judge properly heard the care and protection and the guardianship

---

[13] When the grandparents' attorney first made his appearance, the judge explained to him that the trial was "still in the fitness stage," but because "the evidence does intertwine," she would permit him to be present when "we start talking about who's going to be proposed as guardians." She then advised the attorney, "[U]nless I hear otherwise, you are not going to be participating in the care and protection trial, nor are you going to have access to any of the records of the parents." The attorney said he understood and did not object.

[14] On the ninth day of trial, counsel for the father informed the judge (erroneously) that the grandparents' attorney planned to withdraw. The judge responded that she would "allow the grandparents to sit in on" the department's testimony concerning its position on the grandparents' guardianship petition.

petitions concurrently. See Guardianship of Phelan, 76 Mass. App. Ct. 742, 749 (2010). Nonetheless, the petitions retained their separate character. See id., citing A.M. Karp, Child Welfare Practice in Massachusetts § 19.4.1 (Mass. Cont. Legal Educ. 2006 & Supp. 2009) (even where guardianship and care and protection petitions are heard together, guardianship petition is separate action with its own docket number). As the department was not proposing guardianship as its goal, it was not necessary to formally consolidate the matters. See Care & Petition of Thomasina, 75 Mass. App. Ct. 563, 574 n.19 (2009).

Analogizing to cases in which parents were deprived of their right to participate in child welfare proceedings, directly or through appointed counsel, the grandparents argue that the judge's handling of the proceedings violated their fundamental rights. The analogy is flawed. "Parents have a fundamental liberty interest in maintaining custody of their children, which is protected by the due process clause of the Fourteenth Amendment to the United States Constitution." Care & Protection of Erin, 443 Mass. at 570. Although the grandparents love and provided care for Jacob, they have no constitutionally protected interest in their relationship with him, whether as grandparents, temporary custodians, or guardianship petitioners. See Guardianship of K.N., 476 Mass. 762, 765 (2017) (grandmother with de facto parent-guardian status had no protected liberty

interest giving rise to due process right to appointed counsel in removal proceeding); Care & Protection of Jamison, 467 Mass. 269, 283 (2014) (guardianships "are solely creatures of statute" and "neither the equivalent of nor coextensive with parenthood").

As relatives and the custodians of Jacob at the time of trial, the grandparents did have a statutory right of access to the care and protection proceedings. See G. L. c. 119, § 29D (requiring department to give notice of care and protection and certain other proceedings "to a foster parent, pre-adoptive parent or relative providing care for the child" and to inform same of "right to attend the hearing and to be heard"). However, this right does not confer party status nor the right to cross-examine witnesses in the care and protection proceedings. See id. ("Nothing in this provision shall be construed to provide that such foster parent, pre-adoptive parent or relative shall be made a party to the proceeding"). The reason current custodians are given the right to be heard -- "and need not suffer in silence if the parties choose not to call them" -- is to "ensur[e] that judges have all the relevant information about the child at their disposal." Adoption of Sherry, 435 Mass. 331, 338 (2001). The "best procedure" for exercise of this limited right in any given case is left to the discretion of the trial judge. Id. at 338 n.6.

Similarly, the judge possessed the discretion to sequester witnesses during the trial. "Sequestration of witnesses lies in the discretion of the trial judge." Zambarano v. Massachusetts Turnpike Auth., 350 Mass. 485, 487 (1966). See Custody of a Minor (No. 2), 392 Mass. 719, 726 (1984) (within judge's discretion to exclude testimony of nonparty grandmother where judge had ordered sequestration of witnesses but grandmother remained in court room throughout trial). Here, the grandfather appeared to be coaching the father during his testimony, and the judge could reasonably conclude that the grandparents' presence during the testimony of the mother and the aunt might interfere with their ability to testify fully and frankly. Nonetheless, the grandparents or their attorney were present, or permitted to be present, for substantial portions of the proceedings concerning parental fitness, and they were afforded ample opportunity to be heard.

The grandparents did have the right to participate as parties in the guardianship proceedings, including the right to cross-examine witnesses.[15] The judge consistently recognized these rights and made every effort to protect them. Thus, the

---

[15] These are not constitutional rights; they are procedural rights incident to party status in a civil case. See Covell v. Department of Social Servs., 439 Mass. 766, 787-788 (2003); Frizado v. Frizado, 420 Mass. 592, 596-597 & n.3 (1995); Gilmore v. Gilmore, 369 Mass. 598, 603 (1976).

judge ensured that the grandparents or their attorney was present for the testimony of any witnesses concerning whether the grandparents' continued custody would be in Jacob's best interests, as well as for testimony concerning competing custody arrangements.  Unlike Guardianship of Phelan, 76 Mass. App. Ct. at 754, this is not a case in which the grandparents "never in fact had the opportunity to litigate."[16]

For the first time on appeal, the grandparents object to their partial exclusion; indeed, they contend that it constituted structural error, mandating reversal without a showing of prejudice, because the care and protection proceedings were "inextricably intermingled" with the guardianship proceedings.  The doctrine of structural error, however, "does not control civil issues."  Adoption of Gabe, 84 Mass. App. Ct. 286, 293 (2013).  Although it may provide a "useful analogy" where constitutional rights are at issue, id., the grandparents had no constitutional rights at stake in the proceedings.

---

[16] Although we have commented favorably on the action of a judge presiding over a concurrent termination and guardianship case to give the guardianship petitioner "full access to the proceedings and the evidence" in the termination case, see Guardianship of Phelan, 72 Mass. App. Ct. at 749, quoting Adoption of Yvette (No. 1), 71 Mass. App. Ct. 327, 333-334 (2008), these allusions to the discretionary decision of a single trial judge do not amount to a rule that all guardianship petitioners are entitled "full access" to care and protection or termination cases involving the same child.

In addition to claiming structural error, the grandparents argue that they were prejudiced by their partial exclusion because the judge, in denying their guardianship petition, relied in part on testimony given on days when they were not present and did not have an opportunity to cross-examine witnesses.  See Adoption of a Minor, 22 Mass. App. Ct. 468, 469 n.1 (1986), citing Gilmore v. Gilmore, 369 Mass. 598, 603 (1976) ("any decision on the merits which did not give persons having standing the right to cross-examine the [witness] would have been inappropriate").  Indeed, some testimony relevant to the grandparents' ability to care for Jacob was elicited during their absence, and in hindsight, the judge could have taken a broader view in determining which portions of the care and protection proceedings had potential relevance to the guardianship petition.

Nonetheless, we decline to disturb the adjudication of the guardianship petition, in large measure because of the grandparents' failure to object to the conduct of the proceedings.  "Ordinarily, a party is not entitled to present an argument on appeal on an issue not presented in the court below."  Atlas Tack Corp. v. DiMasi, 37 Mass. App. Ct. 66, 70 (1994).  See Adoption of Bea, 97 Mass. App. Ct. 416, 430 (2020). The rationale behind the waiver rule is that a timely objection affords the trial judge an opportunity to correct any possible

errors in the proceedings.  See <u>Abraham</u> v. <u>Woburn</u>, 383 Mass. 724, 726 n.1 (1981); <u>Commonwealth</u> v. <u>Lenane</u>, 80 Mass. App. Ct. 14, 19 (2011).  Had the grandparents or their attorney argued that testimony to be given in their absence might be relevant to their ability to act as guardians, the judge may well have granted greater access.

This case does not present a clear injustice or implicate broad public policy concerns that might compel us to overlook a clear waiver.  Contrast <u>Rivas</u> v. <u>Chelsea Hous. Auth</u>., 464 Mass. 329, 336-337 (2013); <u>White</u> v. <u>White</u>, 40 Mass. App. Ct. 132, 133–134 (1996).  Much of the testimony taken outside of the grandparents' presence was cumulative of testimony offered while they were in the court room or their attorney was present.  In addition, all of the parties present, except the department, were advocating for the grandparents' custody.  Cf. <u>Care & Protection of Zelda</u>, 26 Mass. App. Ct. 869, 872-873 (1989) (judge did not abuse discretion in denying foster parents' motion to intervene in care and protection proceedings where their interests were adequately represented by existing parties).[17]  Finally, "[t]he best interests of the child are the overarching concern" -- not the rights of other parties.

---

[17] But see <u>Guardianship of B.V.G.</u>, 474 Mass. 315, 326 (2016) (even where interests of subject of guardianship petition are adequately represented, "interested person" within meaning of G. L. c. 190B, § 5-306 [<u>c</u>], has right to intervene).

Adoption of Rico, 453 Mass. 749, 754 (2009). The judge took great care and carefully weighed the evidence of the grandparents' ability to provide for Jacob's best interests. Any error or abuse of discretion in the judge's handling of this complex case does not warrant reversal of her well-reasoned decision to dismiss the grandparents' guardianship petition.

3. Competing permanency plans. In determining that termination of the mother's and the father's parental rights served Jacob's best interests, the judge considered the competing plans proposed by the department, the parents, and Jacob, as well as the grandparents' guardianship petition. The judge determined that the department's plan of adoption by recruitment was in Jacob's best interests. The appellants argue that the department's plan was not sufficiently developed to warrant approval.

"In determining the best interests of the child, the judge must consider, among other things, 'the plan proposed by the department.'" Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting G. L. c. 210, § 3 (c). The judge must also consider plans proposed by the parents or the child. See Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001). Where there are competing plans, "the judge must assess the alternatives and, if both pass muster, choose which plan is in the child's best interests, however difficult the choice may

be." Id. at 475. "The judge's obligation to consider a plan involves much more than simply examining it. The judge must perform a careful evaluation of the suitability of the plan and must meaningfully . . . evaluate what is proposed to be done for the child" (quotations and citation omitted). Adoption of Helga, 97 Mass. App. Ct. 521, 528 (2020). Regardless of the party offering the plan, "[a] judge should provide an 'even handed' assessment of all the facts surrounding both the department's plan and any competing custody or adoption plan." Adoption of Hugo, 428 Mass. at 226 n.8. The judge may even reject all the plans offered and "order an alternative disposition, provided it is consistent with the best interests of the child." Adoption of Cadence, 81 Mass. App. Ct. at 171, citing G. L. c. 119, § 26 (b); G. L. c. 210, § 3.

Whether remaining in the grandparents' custody "was in [Jacob's] best interests presents 'a classic example of a discretionary decision' to which we accord substantial deference." Adoption of Peggy, 436 Mass. 690, 705 (2002), cert. denied sub nom. S.T. v. Massachusetts Dep't of Social Services, 537 U.S. 1020 (2002), quoting Adoption of Hugo, supra at 225. In this regard, we discern no abuse of discretion in the judge's determination that any plans involving the grandparents did not advance Jacob's best interests. The judge concluded that the mother and the father were unfit and likely to remain so. The

father required daily support from one or both of the grandparents and would continue to need their support if they were appointed Jacob's guardians. The grandfather, however, refused to believe that the father's problems were related to mental health issues, minimizing them as difficulties with time management and organization. Similarly, the grandmother denied that the father was abusive of the mother and explained away his conduct. The judge reached the well-founded conclusion that the grandparents were "enmeshed" with the father, and that their inability to place boundaries on the father would be harmful to Jacob.[18]

Nor did the judge abuse her discretion in approving the department's plan. "The adoption plan need not be fully developed to support a termination order; it need only provide sufficient information about the prospective adoptive placement 'so that the judge may properly evaluate the suitability of the department's proposal.'" Adoption of Willow, 433 Mass. at 652-

---

[18] The judge concluded, "It is clear that [the grandparents] love Jacob and they have taken good physical care of him. However, . . . [the grandparents] have continued to prioritize [the f]ather's needs throughout this case above providing stability for Jacob. They have gone to great lengths to cover, intentionally lie and defraud the [c]ourt and/or minimize his deficiencies, and have allowed him access to Jacob outside of authorized visits, in violation of the temporary custody order. This [c]ourt finds that [the grandparents] are neither capable nor willing to maintain safe boundaries with [the f]ather in order to protect Jacob from future abuse and/or neglect."

653, quoting Adoption of Vito, 431 Mass. 550, 568 n.28 (2000).
A suitable plan does not need to identify "prospective adoptive
parents." Care & Protection of Three Minors, 392 Mass. 704, 717
(1984). See Adoption of Scott, 59 Mass. App. Ct. 274, 278
(2003).

The department planned to register Jacob with an adoption
agency, which would "search for a family that would be able to
meet Jacob's educational and emotional needs." The plan
outlined Jacob's family's history with the department and
included personal histories of Jacob, the mother, and the
father, as well as Jacob's medical and developmental history.
The department's adoption social worker testified about the
concrete recruitment steps the department and the adoption
agency would take to identify an appropriate adoptive family.

Relying on Adoption of Varik, 95 Mass. App. Ct. at 771, the
appellants argue that the department's plan "failed to specify
the type of adoptive parents and the characteristics of the home
environment best suited to meet [Jacob's] specific needs." Such
detail was necessary in Adoption of Varik because, as a result
of being physically abused by his father, the child had
exhibited "troubling behavior" in his foster home, "including
lying, a series of thefts, and hoarding food," and was
"disruptive" at school. Id. at 764. Accordingly, "information
describing the kind of home environment and adoptive family

makeup that ideally would best meet Varik's particular needs"
was essential.  Id. at 771.  See Adoption of Dora, 52 Mass. App.
Ct. at 476-477 (where department's plan included two potential
options, and "there was no singular definition of what was
contemplated for" child, judge erred by approving plan and
leaving "choice of adoptive placement to the discretion of"
department).

Although Jacob had specialized medical needs shortly after
he was born, he received treatment resolving those needs.[19]  The
judge found that Jacob was "a happy well adjusted twenty month
old child," "had no special or specific needs," and "would not
have any difficulty transitioning to a new home or bonding to a
subsequent care giver."  As Jacob did not require any particular
type of adoptive parents or home environment, any effort by the
department to provide more detail may have been
counterproductive, narrowing the field of potential adoptive
homes.  The department's plan for Jacob had "content and
substance enough to permit the court meaningfully to evaluate
and consider . . . what [the department] propose[d] to do for

---

[19] Several months after he was born, Jacob was evaluated by
a neurologist for plagiocephaly ("flat head syndrome").  He wore
a helmet from November 2017 until April 2018, at which point
that treatment was no longer necessary.  He was discharged from
the neurologist's care in August 2018.  Jacob was also diagnosed
with asthma, but his condition improved and he no longer needed
treatment as of June 2018.

the child by way of adoption." Adoption of Lars, 46 Mass. App. Ct. 30, 31 (1998), quoting Adoption of Stuart, 39 Mass. App. Ct. 380, 393 (1995).

Moreover, the judge took extra steps to oversee the department's recruitment efforts. Rather than wait twelve months for the mandatory review of the department's permanency plan required by G. L. c. 119, § 29B, the judge retained jurisdiction and ordered the department to report to her every thirty days to enable her to "closely monitor and assess the Department's efforts and progress in identifying a pre-adoptive home." The judge did not "merely . . . issue a broad dispositional order committing the child to the department's custody." Adoption of Cadence, 81 Mass. App. Ct. at 170-171. In these circumstances, the judge did not abuse her discretion in approving the department's plan of adoption by recruitment.

Conclusion. The decrees terminating the mother's and the father's parental rights and approving the department's adoption plan are affirmed. The order dismissing the grandparents' guardianship petition is affirmed.

So ordered.